[Cite as *State v. Hare*, 2018-Ohio-765.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## CLARK COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2017-CA-4 |
| | : | |
| v. | : | Trial Court Case No. 15-CR-649 |
| | : | |
| PRENTISS R. HARE | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 2nd day of March, 2018.

. . . . . . . . . .

ANDREW P. PICKERING, Atty. Reg. No. 0068770, Clark County Prosecutor's Office, Appellate Division, 50 East Columbia Street, 4th Floor, Springfield, Ohio 45501
     Attorney for Plaintiff-Appellee

DARRELL L. HECKMAN, Atty. Reg. No. 002389, One Monument Square, Suite 200, Urbana, Ohio 43078
     Attorney for Defendant-Appellant

. . . . . . . . . . . .

HALL, J.

{¶ 1} Prentiss Hare appeals his convictions for aggravated robbery and felony murder. Finding no error, we affirm.

## I. Background

{¶ 2} Hare was indicted on four counts following the death of Dashun Lumford: purposeful murder, felony-murder with a predicate offense of aggravated robbery, felony-murder with a predicate offense of felonious assault, and aggravated robbery. The case was tried to a jury, which heard the following evidence.

*The death*

{¶ 3} Donald Walton lived in a duplex at 12 South Light Street in Springfield, Ohio. On the morning of December 4, 2015, a Friday, Walton was at home with two friends, Sylvester Howard and Hare. Walton went to a pharmacy for some medicine and returned a couple hours later to find, in addition to Howard and Hare, two other people in his duplex, Ashley Cromlish and Dashun Lumford. Cromlish, an admitted drug addict, was there to buy drugs. She bought crack cocaine from Lumford and smoked it in the house. According to Howard, Lumford also gave some crack to Hare "on credit." When Hare wanted more, Lumford told him that he would have to pay. So, said Howard, Hare went out and sold some food stamps and came back with $70. Hare then bought crack from Lumford until the $70 was gone. Howard testified that everyone was smoking crack and that Cromlish used some heroin that Lumford had given her. Howard also mentioned that Hare was angry because, on a previous occasion, Lumford had sold him bad crack.

{¶ 4} Later, Howard and Walton were sitting in the living room—a smallish rectangular room with a couch and a love seat on opposite walls and a bed on the floor

between them. Cromlish testified that Hare and Walton had told her to "go to the bathroom and stay there." (Tr. 351). But Howard testified that Cromlish had gone to the kitchen to shoot up the heroin that she had gotten from Lumford. Lumford walked into the living room. Suddenly, Hare entered the living room behind Lumford, grabbed him around the throat from behind, and lifted Lumford into the air. The two men fell onto the bed, with Hare landing on top. Hare continued to strangle Lumford from behind with his hands, according to Howard; Walton testified that Hare strangled Lumford using both arms. Lumford barely resisted.

{¶ 5} Howard testified that he grabbed Hare, trying to stop him, but Walton grabbed him. Howard then fled the house. As he was leaving, he heard Hare tell him or Walton to get the money from Lumford. According to Walton, Hare continued to strangle Lumford for five to ten minutes.

{¶ 6} Cromlish testified that while she was in the bathroom, she heard a "thump." She hesitantly opened the bathroom door and saw Hare and Walton carrying Lumford's body through the kitchen and out the back door. Cromlish asked if Lumford would be okay, and one of them replied that he would. Cromlish testified that they threatened her, saying that if she said anything, they would hurt her. She then ran out of the house. Cromlish said that later she was with Hare and some others when she heard Hare say to one of them, "I did it again, I did it again." (*Id.* at 353).

{¶ 7} Walton testified that he and Hare left the house and stopped for a beer, for which Hare paid cash. Then they went to a church to have dinner. While there, someone said that a body had been found behind Walton's house.

{¶ 8} According to Howard, sometime later he sold Hare crack. He said that Hare

threatened him, saying, "What happened to him [Lumford] can happen to you if you don't keep your mouth shut." (Tr. 384).

*The discovery of the body*

{¶ 9} Just a few feet from Walton's duplex is a convenience store called the Main Stop. A little before 3 p.m. that Friday, a Vectren Gas employee found Lumford's body behind the store. He noticed that Lumford's pants and shoes had been removed, with the shoes beside the body and a pair of blue jeans on or near Lumford's head. After getting no response from Lumford, the Vectren employee went into the Main Stop and called 911. When he returned to the body a few minutes later, the pants were gone. The employee noticed what appeared to be drag marks leading away from the body. His impression was that Lumford had been robbed.

{¶ 10} Springfield police officer Jerry Bowen and Detective James McCutcheon responded to the scene. Both men noticed a small abrasion on Lumford's neck. Based on the abrasion, Lumford's missing pants, and the lack of other physical indicia of overdose, neither Bowen nor McCutcheon believed that Lumford had died from a drug overdose. Officer Bowen photographed the scene, including what appeared to be drag marks from the body leading to the rear of Walton's duplex. Police officers found no one inside the duplex.

*The investigation*

{¶ 11} The following Monday, Howard voluntarily went to the police and told them what he knew about Lumford's death. Howard identified Hare from a photo lineup. That same day, based on Howard's information, Detective McCutcheon sought out Walton and Cromlish and spoke with them both. He obtained Walton's consent to search the duplex.

{¶ 12} Kisha Wheeler watched from the street as Walton got into the detective's car. She then entered the duplex, where she had been earlier in the day, and found Hare inside alone. She had heard that a body had been found outside and asked Hare about it. Wheeler testified that Hare then confessed that he had killed Lumford, saying that he killed him by "affixiation." (Tr. 657). She said that he told her that he had killed Lumford for "fleecing" him, for selling him bad cocaine. Hare told Wheeler that he and another person had taken Lumford's body outside. They had been talking for only about ten minutes when Detective McCutcheon arrived to search the premises. Hare was taken into custody.

{¶ 13} During the search of the duplex, police found a pair of blue jeans under the kitchen sink. Walton told police that the blue jeans may be Lumford's, and a DNA analysis of the jeans confirmed this. Police also recovered a cell phone that belonged to Hare on which they found a text message sent on December 4, 2015, that said, "Lol oops I did it again…." (*Id.* at 730; State's Exhibit 13). Hare denied any involvement in Lumford's death.

*The cause of death*

{¶ 14} Deputy Montgomery County Coroner Dr. Robert Schott autopsied Lumford's body on December 5, 2015. Dr. Schott found that Lumford's lungs were "heavy" from an accumulation of "extra blood and frothy-like watery fluid." (Tr. 457). This is a common finding in overdose cases, said Schott, but there are other causes. Dr. Schott collected samples of various fluids and sent them to the toxicology lab for analysis. His initial findings were "pulmonary congestion and edema, suspected drug overdose based on history and heavy lungs, [and] small abrasions of the neck and forehead." (*Id.* at 460).

{¶ 15} After speaking with Howard, Walton, and Cromlish, Detective McCutcheon

contacted Dr. Schott and told him that witnesses had said that Lumford was strangled. So Dr. Schott re-examined Lumford's body. Other than the abrasion on the neck, Dr. Schott found no other unusual neck injuries. But he did find small hemorrhages of the blood vessels in Lumford's eyes, called petechiae. Dr. Schott explained that these ruptures are caused by increased blood pressure in the eyes, which occurs when the veins in the neck (but not the arteries) are compressed such that blood cannot flow back to the heart. Dr. Schott revised his initial findings to strangulation and ruled out an overdose, pending the toxicology analysis.

{¶ 16} The toxicology analysis showed that when Lumford died, he had several drugs in his system, including marijuana and high concentrations of cocaine, fentanyl, and heroin. Dr. Schott testified that these concentrations are not necessarily fatal. But he said that the drug concentrations in Lumford's system were sufficient to produce intoxication. Based on the witness reports of strangulation, the neck abrasion, and the petechiae, it was Dr. Schott's opinion that the cause of death was strangulation.

{¶ 17} Hare presented the testimony of two experts. Dr. Francisco Diaz, a forensic pathologist who worked for the Wayne County, Michigan Coroner, strongly disagreed with Dr. Schott's conclusion on the cause of death. Strangulation, said Dr. Diaz, results in obvious injuries, which are not found in this case. Lumford, he said, did not have the significant injuries to the neck structures that you would expect to find. Medical toxicologist Dr. Glen Burns testified that Lumford had lethal levels of opiates in his system and that the concentration of fentanyl was five times the potentially lethal dose. Dr. Burns testified that Dr. Schott's reliance on petechiae to show strangulation is unjustified because petechiae are not diagnostic and may come from multiple sources.

{¶ 18} The jury found Hare not guilty of purposeful murder (Count 1) but found him guilty of the remaining counts—felony-murder with the predicate offense of aggravated robbery (Count 2), felony-murder with the predicate offense of felonious assault (Count 3), and aggravated robbery (Count 4). The trial court merged Counts 2 and 3 for sentencing purposes, and the state elected sentencing on Count 3. The court sentenced Hare to an aggregate prison term of 26 years to life.

{¶ 19} Hare appealed.

## II. Analysis

{¶ 20} Hare presents six assignments of error. The first two challenge the sufficiency of the evidence supporting aggravated robbery and felony murder. The third assignment of error challenges the manifest weight of the evidence as to the cause of death. The fourth assignment of error challenges the admission of "other acts" evidence. The fifth assignment of error challenges Hare's exclusion from certain portions of the trial. Lastly, the sixth assignment of error presents a claim of ineffective assistance of trial counsel.

### A. The evidence of aggravated robbery is sufficient.

{¶ 21} The first assignment of error alleges that the evidence is insufficient to show that Hare committed aggravated robbery.

{¶ 22} "When reviewing the sufficiency of the evidence, an appellate court does not ask whether the evidence should be believed but, rather, whether the evidence, 'if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.' " *State v. Pountney*, Ohio Sup. Ct. Slip Opinion No. 2018-Ohio-22, ¶ 19, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

"The relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks* at paragraph two of the syllabus.

{¶ 23} Hare was convicted of aggravated robbery under R.C. 2911.01(A)(3), which states: "No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, * * * shall * * * [i]nflict, or attempt to inflict, serious physical harm on another." The state's theory was that Hare took the $70 from Lumford that Hare had given him for the crack. Hare argues that there is no evidence that he took, or attempted to take, anything from Lumford.

{¶ 24} The evidence shows that after smoking crack that Lumford had given him, Hare wanted more. Lumford demanded payment, so, having no money, Hare went out and sold food stamps, returning with $70 cash. Hare then bought $70 worth of crack from Lumford. Howard testified that as he was leaving, after Hare started strangling Lumford, Hare told him to retrieve the money from Lumford. No money was found in Lumford's pants, which were stashed under the kitchen sink. Also, later that day, despite having given all the cash he had to Lumford for the crack, Hare bought beer for himself and Walton. Of course, the money that Hare used could have come from a source other than Lumford. But no evidence of some other source was presented.

{¶ 25} Viewing the evidence in the light most favorable to the state, the evidence is sufficient to find that, after strangling him, Hare took money from Lumford.

{¶ 26} The first assignment of error is overruled.

### B. The evidence of felony murder is sufficient.

{¶ 27} The second assignment of error alleges that the evidence is insufficient to

show that Hare committed felony murder.

{¶ 28} Hare was convicted of felony murder under R.C. 2903.02(B), which states: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code."

{¶ 29} The predicate felony offense here is aggravated robbery. Hare's second assignment of error argument is premised on the conclusion that the evidence of the predicate offense is insufficient. He argues that because there was insufficient evidence to establish aggravated robbery, the evidence that he committed felony murder must also be insufficient. Because we concluded that the evidence is sufficient to find that Hare committed aggravated robbery, his sufficiency argument fails.

{¶ 30} The second assignment of error is overruled.

### C. The evidence supports the finding that Hare strangled Lumford.

{¶ 31} The third assignment of error alleges that the evidence is insufficient to establish the cause of death. Hare's argument, though, appears to challenge the manifest weight of the evidence. He argues that the evidence shows that Lumford died from a drug overdose.

{¶ 32} The manifest weight of the evidence must be distinguished from the evidence's sufficiency, and a different standard of review must be applied:

> In contrast [to a sufficiency challenge], a manifest-weight challenge "concerns 'the inclination of the *greater amount of credible evidence* * * * to support one side of the issue rather than the other.' " (Emphasis sic.) *State*

*v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990). A manifest-weight challenge requires us to consider the entire record, including the credibility of the witnesses, the weight of the evidence, and any reasonable inferences and determine whether " 'the [panel] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983); *accord* R.C. 2953.02.

*State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, ¶ 75. "The credibility of the witnesses and the weight to be given to their testimony is a matter for the trier of facts, the jury here, to resolve." *State v. White*, 2d Dist. Montgomery No. 20324, 2005-Ohio-212, ¶ 65, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). "This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of facts lost its way in arriving at its verdict." (Citation omitted.) *Id.* at ¶ 67.

{¶ 33} The state's expert witness, deputy coroner Dr. Robert Schott, testified that he initially found that Lumford died from a drug overdose. He said that he re-examined Lumford's body after Detective McCutcheon told him that witnesses had said that Lumford was strangled. Dr. Schott found no unusual neck injuries, other than the abrasion. But he did find small hemorrhages, petechiae, in Lumford's eyes that are consistent with strangulation. Dr. Schott testified that based on the new information and his re-examination he revised his initial findings to "possible manual strangulation" and ruled out an overdose. (Tr. 476).

{¶ 34} The results of the toxicology analysis did not change Dr. Schott's opinion on the cause of death. The analysis revealed that when Lumford died he had high concentrations of several drugs in his system—cocaine, fentanyl, heroin, and other opiates. Dr. Schott acknowledged that the concentration of fentanyl was higher than most fatal overdoses he had seen and that heroin can kill at any concentration. But he said that the concentrations in Lumford were not necessarily fatal, though they were enough to produce intoxication. Dr. Schott testified that without knowing about the allegations that Lumford was strangled, he would have concluded that overdose was the cause of death. As it was, though, based on the witness reports, the neck abrasion, and the petechial hemorrhages, it was Dr. Schott's opinion that Lumford was strangled.

{¶ 35} That Lumford did not die from a drug overdose but was strangled is supported by the testimony of other witnesses. Officer Bowen and Detective McCutcheon both testified that, based on their experience, Lumford's death did not look like an overdose. Both Howard and Walton testified that Hare strangled Lumford. And Wheeler testified that Hare confessed to her that he killed Lumford by "affixiation." (Tr. 657). Wheeler also said that Hare told her that his motive for killing him was that Lumford had sold him bad crack. Howard too testified that Hare was mad at Lumford because Lumford had sold him bad crack. Cromlish testified that she saw Hare and Howard carrying Lumford's body out of the house and that they threatened her. Howard said that Hare threatened him too. Cromlish also said that she heard Hare say to someone, "I did it again, I did it again." (*Id.* at 353). And Hare later used the same phrase in a text message that he sent: "Lol oops I did it again…." (*Id.* at 730; State's Exhibit 13).

{¶ 36} Forensic pathologist Dr. Francisco Diaz strongly disagreed with Dr. Schott's

conclusion that Lumford died by strangulation. According to Dr. Diaz, if a person has been strangled to death, the injuries are obvious: "It is something that jumps at the examiner." (*Id.* at 761). He said that victims will fight for their life when deprived of air, so there should be dramatic findings to support strangulation. In this case, said Dr. Diaz, there are no such findings. Dr. Diaz testified that you would expect to find things like bleeding on the larynx, external and internal injuries to the bones and tissues of the neck, and bleeding of the muscles around the neck. None of these symptoms was found on Lumford. But Dr. Schott testified that it is possible to compress the blood vessels in the neck with hands or arms enough to stop blood flow without causing injury. He also said that the intoxicating effects of fentanyl and heroin could have "shut[] down his respiratory drive, making him closer to unconsciousness just from the effects of the drugs." (*Id.* at 506). The drugs, said Dr. Schott, "could certainly make him more compliant, less able to fight off somebody attempting to strangle him without using more force or a weapon or causing any other injury to the body." (*Id.*).

{¶ 37} Medical toxicologist Dr. Glen Burns testified that Lumford had lethal levels of opiates in his system and that the concentration of fentanyl was five times the potentially lethal dose. Dr. Burns also said that fentanyl and heroin are synergetic, meaning the effect of the two together is greater than each alone. He testified that Dr. Schott's reliance on small petechiae to show strangulation is unjustified because petechiae are not diagnostic and may come from many sources, including simply lying face down. But Dr. Burns did not testify that the concentrations of drugs found in Lumford's system are definitively lethal—only potentially lethal. He admitted that it is "possible" that a person could live. (Tr. 880). This is consistent with Dr. Schott's testimony

that the concentration found in Lumford is not necessarily lethal.

{¶ 38} The evidence here presents a conflict among expert opinions as to the cause of Lumford's death. "The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). This principle applies equally when the witnesses are experts. *See State v. Harris*, 9th Dist. Medina No. 16CA0054-M, 2017-Ohio-8263, ¶ 22; *State v. Fenderson*, 5th Dist. Richland No. 09 CA 64, 2010-Ohio-2240, ¶ 61. We do not think that the jury here lost its way simply because it chose to believe the state's witnesses and disbelieve the defendant's witnesses. *Compare White*, 2005-Ohio-212, at ¶ 69 (saying that the jury "did not los[e] its way simply because it chose to believe the State's witnesses and disbelieve Defendant, which it was entitled to do"). We cannot say that the jury "clearly lost its way and created such a miscarriage of justice" as to justify reversal. That strangulation is the cause of death is not only supported by Dr. Schott's testimony but also by the testimony of eyewitnesses and a witness to whom Hare confessed. There is more than enough evidence to support the finding that Hare caused Lumford's death.

{¶ 39} The third assignment of error is overruled.

### D. Other-acts evidence

{¶ 40} The fourth assignment of error alleges that the trial court erred by admitting evidence of Hare's "other acts."

{¶ 41} Hare failed to object at the time that this "other acts" evidence was admitted, so he has waived all but plain error. Crim.R. 52(B) states that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention

of the court." "By its very terms, the rule places three limitations on a reviewing court's decision to correct an error despite the absence of a timely objection at trial. First, there must be an error, i.e., a deviation from a legal rule. Second, the error must be plain. To be 'plain' within the meaning of Crim.R. 52(B), an error must be an 'obvious' defect in the trial proceedings. Third, the error must have affected 'substantial rights.' We have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial." (Citations omitted.) *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002).

{¶ 42} "Evid.R. 404(B) * * * precludes the admission of evidence of other crimes, wrongs, or acts offered to prove the character of an accused in order to show that the accused acted in conformity therewith, but it does not preclude admission of that evidence for other purposes." *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, syllabus. These "other purposes" for which other-acts evidence may be admitted include "proof of motive." Evid.R. 404(B). A three-step analysis determines whether to admit other-acts evidence:

The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Evid.R. 401. The next step is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B). The third step is to consider whether the probative value of the other acts

evidence is substantially outweighed by the danger of unfair prejudice. *See*

Evid.R 403.

*Williams* at ¶ 20.

**{¶ 43}** Hare argues that the following testimony about his other bad acts should not have been admitted: Cromlish's testimony that he smoked crack; Howard's testimony that he smoked crack and had heroin; Howard's testimony that he sold food stamps for cash; Howard's testimony that Hare threatened him; and Cromlish's testimony that she heard him say, "I did it again."

**{¶ 44}** Cromlish's testimony that Hare smoked crack was admissible. The testimony was in response to the prosecutor's question about what Walton and Hare did in the hours before Hare attacked Lumford. It does not appear that the testimony was elicited to prove character. Also, the evidence serves a legitimate purpose. It helps to prove that Hare's motive for killing Lumford was retaliation for Lumford having sold him bad crack.

**{¶ 45}** Howard too testified that Hare smoked crack in the hours before he attacked Lumford, and he testified about the heroin. But this testimony was elicited on cross-examination by defense counsel. So if the admitting it was error, the error was invited. *Compare State v. Lenoir*, 2d Dist. Montgomery No. 22239, 2008-Ohio-1984, ¶ 24 (concluding that if it was error to admit testimony that the defendant tried to bribe the witness with drugs so that she would not testify against him in the assault case, it was invited error because the testimony was elicited by defense counsel on cross-examination). "Under the doctrine of 'invited error,' an appellant is barred from attacking a judgment because of an error for which the appellant was responsible." *Id.*, citing *State*

*ex rel. The V Cos. V. Marshall*, 81 Ohio St.3d 467, 692 N.E.2d 198 (1998).

{¶ 46} Howard testified that Hare sold $140 worth of food stamps for $70 and used the money to buy crack from Lumford. This evidence was not elicited to prove Hare's character but as evidence to establish Hare's motive for killing Lumford and to prove Lumford would have had money that was missing after what amounted to an aggravated robbery.

{¶ 47} Howard testified that Hare threatened him, saying that Hare told him, "What happened to him [Lumford] can happen to you if you don't keep your mouth shut." (Tr. 384). But "[e]vidence of threats or intimidation of witnesses reflects a consciousness of guilt." *State v. Hamm*, 1st Dist. Hamilton Nos. C-160230, C-160231, 2017-Ohio-5595, ¶ 20, citing *State v. Richey*, 64 Ohio St.3d 353, 357, 595 N.E.2d 915 (1992). So this testimony is "admissible as an admission by conduct." *Id*.

{¶ 48} Lastly, Cromlish testified that when she was later with Hare and some others, she heard Hare tell someone, "I did it again, I did it again." (Tr. 353). This is not a wrongful act under Evid.R. 404(B). Rather, it is an admission by a party-opponent, which is admissible under Evid.R. 801(D)(2)(a). *See State v. Perez*, 9th Dist. Lorain No. 98CA007235, 2000 WL 296090, *5-6 (Mar. 22, 2000). Hare argues that this admission goes beyond simply admitting to strangling Lumford. He says that "I did it again" implies that he had strangled or murdered someone before, which is highly prejudicial. Hare says that the "again" portion of the admission should not have been allowed, citing this court's decision in *State v. Hawn*, 138 Ohio App.3d 449, 741 N.E.2d 594 (2d Dist.2000). In *Hawn*, we concluded that testimony about a domestic-violence incident and about a hair-pulling injury and black eye caused by the defendant were inadmissible under Evid.R. 404(B)

because the evidence was "wholly independent of the offense for which [the defendant] was on trial." *Hawn* at 464. Here, though, Hare's admission is to one of the offenses for which he was on trial.

**{¶ 49}** Ultimately, we conclude it was not error to admit the challenged testimony and not an obvious defect in the proceedings. Moreover, even if none of the challenged testimony should have been admitted, given all the other evidence presented that Hare strangled Lumford because he was angry with him for selling him bad crack, we do not think that the absence of the challenged testimony would have changed the outcome of the trial. Accordingly we find no plain error in admission of the challenged evidence.

**{¶ 50}** The fourth assignment of error is overruled.

### E. Hare's presence was properly waived.

**{¶ 51}** The fifth assignment of error alleges that the trial court erred by conducting portions of the trial without Hare's presence. Hare says that he was improperly excluded from a jury view and a conference on the admission of exhibits.

**{¶ 52}** "An accused has a fundamental right to be present at all critical stages of his criminal trial. Section 10, Article I, Ohio Constitution; Crim.R. 43(A). An accused's absence, however, does not necessarily result in prejudicial or constitutional error. '[T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, *and to that extent only*.' " (Emphasis sic.) *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 139, quoting *Snyder v. Massachusetts*, 291 U.S. 97, 107-108, 54 S.Ct. 330, 78 L.Ed. 674 (1934).

**{¶ 53}** Hare's presence was properly waived. Hare's defense counsel expressly waived Hare's presence at the jury view, telling the court that Hare "wants to waive his

appearance at the view." (Tr. 181). Hare was present in the courtroom at the time and did not voice any objection. Defense counsel also expressly waived Hare's presence at the exhibit conference while Hare was in the courtroom, and he did not object. Therefore Hare's presence was properly waived. *Compare Frazier* at ¶ 144 (concluding that the defendant's presence at an in-chambers conference was properly waived where the defendant was in open court and did not object when defense counsel waived his presence); *State v. Hayes*, 2d Dist. Montgomery No. 26379, 2016-Ohio-7241, ¶ 109 (same). *See also United States v. Gagnon*, 470 U.S. 522, 528, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985) (saying that a trial court "need not get an express 'on the record' waiver from the defendant for every trial conference which a defendant may have a right to attend").

**{¶ 54}** And even if Hare's presence was not properly waived, he fails to show prejudice from his absence at either portion of the trial. "[A] jury view is not a critical stage in the trial proceedings." *State v. Stivender*, 2d Dist. Montgomery No. 19094, 2002-Ohio-6864, ¶ 11, citing *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81. "In order to demonstrate reversible error, Defendant must show that he was prejudiced by his absence from the jury view." *Id.*, citing *Cassano*. Hare has not shown that he was prejudiced by his absence from the jury view. Moreover it is commonly accepted that transportation of a defendant in custody to a jury view in a secured fashion could have a negative impact on the jury so it is routinely waived as sound trial strategy. As for the exhibit conference, a defendant suffers no prejudice if "his absence occurred during a discussion involving legal or scheduling issues within the professional competence of counsel." *Frazier* at ¶ 142.

**{¶ 55}** The fifth assignment of error is overruled.

## F. Ineffective assistance of counsel

{¶ 56} The sixth assignment of error alleges that Hare was denied the effective assistance of counsel. Hare argues that defense counsel was ineffective for failing to object to the admission of the others-acts evidence.

{¶ 57} To show that defense counsel was ineffective, Hare must prove that counsel's performance fell below an objective standard of reasonable representation and that the deficiency prejudiced him. *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus, citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "[A] court must indulge in a strong presumption that the challenged action might be considered sound trial strategy. Thus, judicial scrutiny of counsel's performance must be highly deferential." (Citations omitted.) *State v. Bird*, 81 Ohio St.3d 582, 585, 692 N.E.2d 1013 (1998).

{¶ 58} The whole of Hare's argument is that "[t]here can be no strategic reason for failing to object to a litany of other felonious acts of defendant." We disagree. As we said, Cromlish's testimony that Hare smoked crack was not elicited to prove Hare's character and was admissible to show Hare's motive for killing Lumford. Also, defense counsel could reasonably have thought that this testimony, accompanied as it was by Cromlish's testimony that she and Walton smoked crack too, hurt Cromlish's and Walton's credibility more than it hurt Hare's defense. Howard's testimony that Hare smoked crack came in response to defense counsel's questioning about whether Lumford sold Hare bad crack on the day that Lumford died. Defense counsel could have been trying to undermine the state's case by suggesting that if Hare was angry with Lumford for selling him bad crack in the past, it does not make sense that Hare would have bought more crack from

Lumford. As for Howard's testimony about heroin, the testimony indicates that it was Lumford who had the heroin, which he gave to Cromlish. Howard's testimony about Hare selling food stamps for cash was not elicited to prove Hare's character but to help establish Hare's motive for killing Lumford and to prove aggravated robbery. And Howard's testimony that Hare threatened him was admissible as conduct demonstrating consciousness of guilt. Finally, Cromlish's testimony that she heard Hare tell someone "I did it again" is admissible as an admission by a party-opponent.

{¶ 59} None of defense counsel's challenged conduct constitutes unreasonable representation. And even if it did, the deficiency did not prejudice Hare. Like we have already said, given all the other evidence presented that Hare strangled Lumford because he was angry with Lumford for selling him bad crack, the absence of any or all of the challenged testimony would not have led to acquittal on any of the charges.

{¶ 60} The sixth assignment of error is overruled.

### III. Conclusion

{¶ 61} We have overruled each of the assignments of error presented. The trial court's judgment is therefore affirmed.

. . . . . . . . . . . . .

WELBAUM, P.J. and FROELICH, J., concur.

Copies mailed to:

Andrew P. Pickering
Darrell L. Heckman
Hon. Richard J. O'Neill