**[Cite as *State v. Smith*, 2018-Ohio-2567.]**

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 27585 |
| | : | |
| v. | : | Trial Court Case No. 16-CR-487/2 |
| | : | |
| SHAWN D. SMITH, JR. | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

O P I N I O N

Rendered on the 29th day of June, 2018.

. . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45402
        Attorney for Plaintiff-Appellee

J. DAVID TURNER, Atty. Reg. No. 0017456, P.O. Box 291771, 101 Southmoor Circle NW, Kettering, Ohio 45429
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1} Shawn D. Smith, Jr., was convicted after a jury trial in the Montgomery County Court of Common Pleas of murder and two counts of felonious assault, each with firearm specifications; the court, after a bench trial, found him guilty of having weapons while under disability. Smith received an aggregate sentence of 37 years to life in prison.

{¶ 2} Smith appeals from his conviction, claiming that the trial court (1) failed to properly employ the three-prong analysis under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), (2) erred in excluding evidence regarding one victim's character (dangerousness) and the defendant's awareness of specific acts of violence by that victim, and (3) erred in permitting evidence of unindicted acts by Smith.

{¶ 3} For the following reasons, the trial court's judgment will be affirmed.

### I. Factual and Procedural History

{¶ 4} The State's evidence at trial established the following facts.

{¶ 5} On the morning of January 14, 2016, Jazmine Johnson left her 13-month-old son, Elijah, with Isaiah Smith ("Isaiah"), whom Johnson was dating.[1] Johnson took Elijah to the home of Diana Hicks, Isaiah's grandmother. At some point, Isaiah left Hicks's home with Elijah and walked to the home of his (Isaiah's) mother, who lived a few houses away.

{¶ 6} On the afternoon of January 14, 2016, Dontay King went to common pleas court for unrelated cases, where he pled guilty to drug and gun charges. Expecting to be taken into custody, King had $2,500 with him so that the money would be placed in his account at prison. However, King was not taken into custody after the plea. King

---

[1] Shawn Smith and Isaiah Smith are not related.

left the courthouse and went to pick up his friend, Smith, in a car he (King) had borrowed. While Smith and King were driving around, King received a call from Isaiah asking for some marijuana. King had met Isaiah through Isaiah's girlfriend, Johnson. King drove to the intersection of Queens Avenue and Dewitt Drive to meet Isaiah.

{¶ 7} At approximately 4:10 p.m., Isaiah got in the back passenger side of King's car, and King showed Isaiah the marijuana. Isaiah then pulled out a gun and pointed it at King's and Smith's heads. Isaiah told King and Smith to empty their pockets, and they gave Isaiah money and marijuana. King, who was armed, tried to pull out his gun, but Isaiah saw him. Isaiah pulled the trigger of his gun, but it did not go off. Isaiah then got out of the car with the money, a duffle bag of marijuana, and various documents belonging to King. King drove away, passing a school bus. Isaiah ran after and shot at the car. Isaiah then returned to his mother's home with the money and duffle bag.

{¶ 8} King drove toward Smith's home. According to King, Smith was angry and asked King how he knew Isaiah. At Smith's home, King noticed a bullet hole on the right fender. Smith went into his residence and shortly came back out.

{¶ 9} The two got back into King's vehicle and drove back to the area where they had been robbed, looking for Isaiah; Smith gave King directions to Hicks's (Isaiah's grandmother's) home; Smith told King that Isaiah would be at that house. King pulled over, and Smith fired multiple shots with a semi-automatic firearm at Hicks's house from the open passenger window of King's car.

{¶ 10} After Smith shot at Hicks's house, they continued driving and saw Isaiah nearby on the sidewalk; Isaiah was carrying the duffle bag that had been taken from King. (King testified that approximately 15 minutes had elapsed since Isaiah had robbed them.)

An SUV and a blue Malibu were parked in front of the house (Isaiah's mother's house). According to King, King sped up, and as they approached, Isaiah began shooting at them. King testified that he could see that Isaiah was holding a small child in his other arm. King testified that Smith shot back at Isaiah through the open passenger window as King drove past.

{¶ 11} Hearing the gunshots, the SUV drove off. Isaiah entered the Malibu, his grandmother's vehicle, and he told Hicks that he had been shot. Hicks also drove off.

{¶ 12} King noticed that Isaiah had entered the blue Malibu, and Smith directed King to turn around and follow the Malibu. After the two cars turned onto Gettysburg Avenue, Smith told King to pull alongside the Malibu. After King pulled his car even with the driver's side of the Malibu, Smith fired several more times at the Malibu. Shots hit the Malibu; Hicks and Elijah were injured by the gunfire.

{¶ 13} Hicks turned onto Hillcrest Avenue, but King continued straight on Gettysburg Avenue. King and Smith no longer discussed finding Isaiah. King testified that he got rid of some bullet casings that had fallen into the car, and they switched to Smith's vehicle, a BMW. The two then went to take King's cousin's children to drill practice. Later than evening, King and Smith saw a news report about the shooting.

{¶ 14} Hicks drove Isaiah and Elijah to Good Samaritan Hospital, dropping them off at 4:30 p.m. Hicks drove off, but was later transported to Miami Valley Hospital. Elijah was transferred to Dayton Children's Hospital with multiple gunshot wounds, where he died from the gunshot wound to his torso.

{¶ 15} King was apprehended the following day. He ultimately admitted his involvement in the shootings and identified Smith as the shooter. He also told the

detective that Isaiah had used the baby as a shield. King later pled guilty to involuntary manslaughter and agreed to testify against Smith.

{¶ 16} Smith was apprehended on the morning of January 18, 2016.

{¶ 17} Smith offered three witnesses on his behalf, and he testified in his own defense. Candace Jacobs testified that she drove toward the bus stop to meet her children after they got off the school bus on January 14, 2016. While she was talking with her children near the bus stop, a car tried to pass her. Jacobs then heard gunshots and saw a man running with a duffle bag and holding his arm straight out "like he had a gun in his hand." Jacobs saw the man near the intersection of Genesee Avenue and Dewitt Drive (a block from the robbery site).

{¶ 18} Nancy Phillips testified that she drove into the relevant neighborhood a little after 4:00 p.m. on January 14, 2016, to conduct an insurance physical for her employer. As she was driving down Arlene Avenue, she heard gunshots to her right. Phillips saw two vehicles – a dark car and a dark SUV – speeding towards her. Phillips testified that she saw the sedan turn around, at which time she saw a man in the passenger seat with a gun.

{¶ 19} Janay Corbitt, King's cousin, testified that King and a friend came to her home at approximately 4:30 p.m. on January 14, 2016. Corbitt stated that she had arranged with King for King to take her children to drill practice, which started at 5:00 p.m. King had arrived at her home in a BMW. Corbitt had previously identified Smith as the friend who came with King.

{¶ 20} Smith testified on his own behalf. According to Smith, after King picked him up, King asked, "Do you mind if I stop somewhere for a minute?" Smith testified that

he agreed, and he was unaware that King was meeting Isaiah for a drug transaction. During the transaction, Isaiah pulled a gun on King and Smith and appeared angry that Smith was there. Smith testified that he was armed, but did not have a chance to reach for his gun. While in the car, Isaiah tried to shoot King, but the gun did not fire. After threatening King and Smith, Isaiah got out of the car, and King drove off. Smith testified that, as they were going around a car and a school bus, he heard "a whole bunch of shots." Smith testified that he "was scared; I was angry and real fear." (Trial Tr. at 876.)

{¶ 21} As King drove away, Smith pulled out his gun and placed it on his lap. Smith stated that King drove around a couple blocks, stopped at Isaiah's grandmother's house, took Smith's gun from Smith's lap, and "fire[d] a couple shots at the house." (Trial Tr. at 876.) King and Smith then went to Smith's uncle's home, where they tried to calm down.

{¶ 22} Smith testified that King indicated that he (King) needed to go to his cousin's house to pick up her children, and they were heading in that direction when they encountered Isaiah again; Isaiah was standing on the sidewalk "by some cars." Smith denied that they were looking for Isaiah or trying to get their belongings back. Smith testified that he and King were just talking when he (Smith) heard multiple gunshots; Smith ducked down and "kind of blindly * * * just fired a couple shots back" at Isaiah. (Trial Tr. at 879.)

{¶ 23} Smith testified that he was "mad" and "scared" when Isaiah fired at them. He said that his "hands [were] still shaking because I can't believe the situation." (Trial Tr. at 880.)

{¶ 24} Smith stated that King started to head out of the neighborhood, but a car

was in the way. King turned around to find another way out. Smith denied that he directed King where to go; Smith stated, "I'm just [a] passenger at this point." (Trial Tr. at 882.) Smith stated that he did not look to see which vehicle Isaiah had entered.

{¶ 25} Smith testified that he and King "end[ed] up on Gettysburg together" with Isaiah. Smith stated that he saw Isaiah with "a gun out the window and I fired a couple more shots and we sped off and I thought they were going [to] chase behind us, but they turned off." (Trial Tr. at 889.) Smith testified that he "probably wouldn't be here telling this story right now" if he did not shoot back. (Trial Tr. at 884.) Smith stated that he shot at Isaiah in self-defense only; he further testified, "I wouldn't fire a gun at nobody unless it was self-defense." When asked about Elijah, Smith expressed his regret and said that he "never want[s] to harm anybody that's not trying to harm me." Smith stated that he was not aware than anyone was injured until he saw the news.

{¶ 26} On April 28, 2016, Smith was charged in a 10-count indictment with the felony murder of Elijah (felonious assault – deadly weapon), felonious assault of Elijah (deadly weapon), felony murder of Elijah (felonious assault - serious physical harm), felonious assault of Elijah (serious physical harm), felonious assault of Isaiah (deadly weapon), felonious assault of Isaiah (serious physical harm), felonious assault of Hicks (deadly weapon), felonious assault of Hicks (serious physical harm), discharge of a firearm upon or over a public road or highway, and having weapons while under disability. The murder and felonious assault charges each included two firearm specifications.

{¶ 27} The matter proceeded to a jury trial in March 2017; the weapons-under-disability charge was tried to the bench. At trial, Smith sought to present evidence of prior wrongful conduct by Isaiah and of Isaiah's reputation for violence; the trial court

excluded the evidence. After deliberations, the jury convicted Smith of all charges and specifications; the trial court convicted Smith of having weapons while under disability.

{¶ 28} After merging several offenses and specifications, the trial court sentenced Smith to 15 years to life in prison for the murder of Elijah, 5 years in prison for the felonious assault of Isaiah (to be served concurrently with the sentence for murder), 8 years in prison for the felonious assault of Hicks, and 36 months for having weapons while under disability; the sentences for murder, felonious assault of Hicks, and having weapons while under disability were to be served consecutively. Smith received an additional 11 years for firearm specifications. His aggregate sentence was 37 years to life in prison.

{¶ 29} Smith appeals from his conviction, raising three assignments of error.

## II. *Batson* Challenge

{¶ 30} In his first assignment of error, Smith claims that the trial court erred in denying his *Batson* challenge to the State's use of a peremptory challenge on Prospective Juror #5, J.N. Smith claims that the trial court improperly failed to proceed to the third prong of the *Batson* test and determine whether the State's reason for the peremptory challenge was credible and not pretextual.

{¶ 31} In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court held that the Equal Protection Clause forbids the State from exercising a peremptory challenge to excuse a juror solely because of that juror's race. *See also State v. Murphy*, 91 Ohio St.3d 516, 747 N.E.2d 765 (2001) (applying *Batson*). "The Equal Protection Clause guarantees the defendant that the State will not exclude members of his race from the jury venire on account of race, or on the false assumption that members of his race as a group are not qualified to serve as jurors[.]"

(Citations omitted.)  *Batson*, 476 U.S. at 86.  The Supreme Court subsequently extended *Batson* to criminal defendants who are not of the same race as the excluded jurors.  *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).  The Supreme Court has since held that the exercise of a peremptory challenge based on a prospective juror's gender also violates the Equal Protection Clause.  *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.89 (1994).

{¶ 32} The Supreme Court has made clear that the harm that results from discrimination in jury selection is not limited to the harm caused to the litigants.

> Discrimination in jury selection, whether based on race or on gender, causes harm to the litigants, the community, and the individual jurors who are wrongfully excluded from participation in the judicial process.  The litigants are harmed by the risk that the prejudice that motivated the discriminatory selection of the jury will infect the entire proceedings.  The community is harmed by the State's participation in the perpetuation of invidious group stereotypes and the inevitable loss of confidence in our judicial system that state-sanctioned discrimination in the courtroom engenders.

*J.E.B.*, 511 U.S. at 140.  Thus, "whether the trial is criminal or civil, potential jurors, as well as litigants, have an equal protection right to jury selection procedures that are free from state-sponsored group stereotypes rooted in, and reflective of, historical prejudice." *Id.* at 128; *see also Powers v. Ohio*, 499 U.S. 400, 409, 111 S.Ct. 1364, 113 L.Ed.2d 411 ("An individual juror does not have a right to sit on any particular petit jury, but he or she does possess the right not to be excluded from one on account of race.").

**{¶ 33}** *Batson* established a three-step analysis for trial courts to decide claims of race-based challenges to jurors:

First, a defendant must make a prima facie case that the prosecutor is engaged in racial discrimination. Second, if the defendant satisfies that burden, the prosecutor must provide a racially neutral explanation for the challenge. Finally, the court must decide, based on all the circumstances, whether the defendant has proved purposeful racial discrimination. In doing so, the court must consider the circumstances of the challenge and assess the plausibility of the prosecutor's explanation in order to determine whether it is merely pretextual.

(Citations omitted.) *State v. Johnson*, 144 Ohio St.3d 518, 2015-Ohio-4093, 45 N.E.3d 208, ¶ 21. "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez v. New York*, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991); *see also State v. Evans*, 2d Dist. Montgomery No. 27178, 2017-Ohio-8184, ¶ 27 ("The prosecutor's articulation of multiple race-neutral reasons for the peremptory strike renders moot whether Evans established the first step of a prima-facie case.").

**{¶ 34}** "Review of a *Batson* claim largely hinges on issues of credibility. Accordingly, we ordinarily defer to the findings of the trial court. * * * Whether a party intended to racially discriminate in challenging potential jurors is a question of fact, and in the absence of clear error, we will not reverse the trial court's determination." *Hicks v.*

*Westinghouse Materials Co.*, 78 Ohio St.3d 95, 102, 676 N.E.2d 872 (1997). *See also Johnson* at ¶ 23; *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 53. Neither the effectiveness of *Batson* nor the wisdom of allowing peremptory challenges is before us. *Compare, e.g., State v. Saintcalle*, 178 Wash.2d 34, 309 P.3d 326 (2013) (discussing racial discrimination in jury selection and the shortcomings of *Batson*).

{¶ 35} The prosecutor and defense counsel each spoke with J.N. during voir dire. The prosecutor had the following exchange with her:

[PROSECUTOR]: All right. And again, we're talking about, where we started was somebody who knows somebody who's been convicted or charged or investigated or gone through diversion programs. Does that apply to anybody here? I saw some hands. I see one over here. [J.N.]?

PROSPECTIVE JUROR [J.N.]: I'm a caseworker so mental health and drug unit so --

[PROSECUTOR]: That's pretty much what you do.

PROSPECTIVE JUROR [J.N.]: Yeah.

[PROSECUTOR]: And you deal with every day. Where do you work?

PROSPECTIVE JUROR [J.N.]: South Community.

[PROSECUTOR]: Okay. So and there's a lot of South Community association with reports and rehabilitative programs.

PROSPECTIVE JUROR [J.N.]: Uh-huh.

[PROSECUTOR]: What's your specific job?

PROSPECTIVE JUROR [J.N.]: A caseworker with the health and drug unit

so.

[PROSECUTOR]: So you're dealing with a lot of people who are seeking court-ordered help?

PROSPECTIVE JUROR [J.N.]: Some of them.

[PROSECUTOR]: Okay. And then people come to you from other directions as well?

PROSPECTIVE JUROR [J.N.]: Uh-huh.

[PROSECUTOR]: There is elements of drug abuse in this case. There's elements -- they [sic] are going to be drugs that were found and maybe people who were using drugs. So that's going to sort of be something that you're going to hear a lot about in this case. It's certainly going to be around the edges. How do you feel that -- do you feel that basically what you know in your experiences that you could be fair and listen to this evidence?

PROSPECTIVE JUROR [J.N.]: Yeah, but we have a different (indiscernible). I can treat everybody differently what their situation is so.

[PROSECUTOR]: Have you encountered people in your job that you feel have been treated fairly by the criminal justice system?

PROSPECTIVE JUROR [J.N.]: Yes.

[PROSECUTOR]: Have you encountered people in your job that you feel have been treated unfairly by the criminal justice system?

PROSPECTIVE JUROR [J.N.]: Yes.

[PROSECUTOR]: Okay. Which do you encounter more?

PROSPECTIVE JUROR [J.N.]: Fairly.

[PROSECUTOR]: Fairly?

PROSPECTIVE JUROR [J.N.]: Uh-huh.

[PROSECUTOR]: With respect to the unfairly does that have something to do with sometimes we don't always do a great job of finding mental health, drug addiction, and handling those kind of problems?

PROSPECTIVE JUROR [J.N.]: Yes, ma'am.

[PROSECUTOR]: Okay. And programs like there's not very many out there that handle dual diagnosis?

PROSPECTIVE JUROR [J.N.]: Uh-huh.

[PROSECUTOR]: Like your department does. Do you feel that you would be extra hard on the State of Ohio or the state's witnesses to make sure that and sort of make our burden any higher because of your job?

PROSPECTIVE JUROR [J.N.]: No.

[PROSECUTOR]: Okay. You could come in with fresh eyes and be fair?

PROSPECTIVE JUROR [J.N.]: Uh-huh, yes.

[PROSECUTOR]: Thank you, ma'am.

(Trial Tr. 66-68.)

{¶ 36} During defense counsel's voir dire questioning, he asked different prospective jurors about their experiences and whether they believed they would be fair jurors. Defense counsel had the following exchange with J.N.

[DEFENSE COUNSEL]: Okay. [J.N.], you've had a lot of life experiences that would put you in connection with people that, well, maybe your life

experiences are like mine. We see a lot of people in a lot of different situations.

PROSPECTIVE JUROR [J.N.]: Sure.

[DEFENSE COUNSEL]: And do you think that makes you a better juror or a tainted juror?

PROSPECTIVE JUROR [J.N.]: I don't think I'm better than anybody so I wouldn't be a better juror. I can try to differentiate from the facts, from what other people say and kind of make my decision based off that, the facts.

* * *

[DEFENSE COUNSEL]: Do you think your line of work in any way has slanted your view of things or you think it's actually evened it out more?

PROSPECTIVE JUROR [J.N.]: I think it's evened it out.

[DEFENSE COUNSEL]: Yeah.

PROSPECTIVE JUROR [J.N.]: I see both sides of each, the wrong and the good of people.

[DEFENSE COUNSEL]: Thank you.

Trial Tr. at 131-132.

{¶ 37} In chambers, the State exercised its first peremptory challenge to excuse J.N. Defense counsel objected under *Batson.* The court asked defense counsel to indicate what facts and circumstances raised an inference that the peremptory challenge was used to exclude J.N. on the basis of race. Counsel stated:

Shawn Smith, for the record, is black or African-American. There are only three black jurors not only in the 12 but in the entire panel that's remaining.

[J.N.] seemed like she was a well-educated person who had no answers to any question from the prosecution or from the defense that would raise a concern. And so that's the reason why we're making the claim.

**{¶ 38}** The trial court then provided the prosecutor an opportunity to respond. The prosecutor told the court:

I don't believe this actually comes down to the race of defendant nor any more so than it comes down to the race of the baby who was also African-American, black child, and as is virtually all the witnesses in the case. The state's motion has nothing to do with the race of the juror. It has to do with the fact that she is in behavioral healthcare which is a sociological, psychological kind of role that always concerns the state and that type of behavior, in that type of employment because they're very much people in line of work are often very much looking for the good in people.

And she even expressed that as she was talking about she was working with people who are suffering from mental health and from drug addiction. And she's seen, in her opinion, people who have been fairly treated by the law but also some people who have been unfairly treated by the law. And based upon her work with that community of people who have mental health problems and drug problems, she has some views about that. The state is concerned about that. The state is concerned with a propensity based upon her employment and based upon her choice of career to be more sympathetic to the defendant and follow sympathy as opposed to what the facts are, what the law is. And the state would be

making this request regardless of her race.

(Trial Tr. at 171-172.)

{¶ 39} Defense counsel responded to the prosecutor's statement, saying, "None of her answers would be supportive of that -- of those conclusions drawn. She seemed to indicate that she would be fair and impartial and sides with neither the defense nor the state." (Trial Tr. at 172.)

{¶ 40} The trial court overruled the *Batson* challenge, reasoning:

I overrule the *Batson* challenge. I think the state has articulated a race-neutral reason. The employment work history of the prospective juror in question, certainly she's in a social service agency which can be seen as the career path of someone who, to their credit, has a strong sense of the good in all people and a sense of helping people having difficulty which is separate and distinct from any race-based reason for the challenge.

I believe the defense has not made a prima facie showing that the prosecutor has exercised that peremptory challenge on their [sic] basis of race. Therefore, I overrule the *Batson* challenge and we do not go to the second stage or prong of the *Batson* analysis.

(Trial Tr. at 172-173.)

{¶ 41} On appeal, Smith claims that the trial court improperly applied the *Batson* three-prong analysis by failing to reach the third prong.

{¶ 42} After defense counsel indicated that he wished to make a *Batson* challenge, the trial court, as required by the first *Batson* prong, asked defense counsel to articulate the reasons for the challenge. Counsel explained that he found no basis for the State's

peremptory challenge. We construe defense counsel's argument to be that, in the absence of an apparent proper basis for the State's peremptory challenge, the trial court should infer that the prosecutor exercised the challenge on the basis of race, especially given defense counsel's reference to the racial composition of the venire.

{¶ 43} Although the trial court later indicated that it did not need to move on the second prong of the *Batson* test, the trial court asked the prosecutor to respond to defense counsel's argument. In so doing, the prosecutor provided what she represented as a racially neutral explanation for the challenge. Specifically, the prosecutor emphasized J.N.'s occupation, contact with individuals with mental health and drug addiction issues, and her views on how clients have been treated by the court system as the bases for the challenge. The prosecutor's articulation of a race-neutral reason satisfied the second prong of the *Batson* test and rendered moot whether defense counsel had demonstrated a prima facie case of racial discrimination.

{¶ 44} The trial court provided defense counsel an opportunity to respond before it ultimately ruled on defense counsel's *Batson* challenge. After defense counsel responded, the trial court found that the prosecutor had offered a race-neutral explanation for the peremptory challenge.

{¶ 45} The State argues that the trial court satisfied its obligation under the third prong when it considered and evaluated the prosecutor's race-neutral explanation for striking J.N., found the explanation to be credible, and overruled the *Batson* challenge. The State further argues that, "while the trial court did not explicitly find that the prosecutor's explanation for striking [J.N.] was credible, that finding is implicit in its stated rationale for overruling Smith's *Batson* challenge, and the trial court's finding is not clearly

erroneous."

**{¶ 46}** Under *Batson's* third prong, the trial court was required to decide, based on all the circumstances, whether purposeful racial discrimination had been proved.   After the prosecutor articulated her reason for excusing J.N., the trial court did not expressly state that it found the prosecutor's stated rationale to be credible or that the prosecutor's explanation was not a pretext for purposeful discrimination.

**{¶ 47}** Nevertheless, in rejecting Smith's *Batson* challenge, the trial court considered the prosecutor's reasons for the challenge, and it expressly commented that J.N. did work for a "social service agency[,] which can be seen as a career path" for individuals who strongly wish to help others and see the good in others.   We agree with the State that the trial court implicitly found not only that the prosecutor's reasons for the peremptory challenge were race neutral, but also that they were credible and not a pretext for discrimination.

**{¶ 48}** We recognize that the trial court created ambiguity when it concluded with "I believe the defense has not made a prima facie showing that the prosecutor has exercised that peremptory challenge on their basis of race.   Therefore, I overrule the *Batson* challenge and we do not go to the second stage or prong of the *Batson* analysis." We encourage trial courts to scrupulously follow *Batson's* three-prong structure and to clearly articulate their credibility findings.   Nevertheless, given the entire record before us, it appears that the trial court considered all the circumstances of the challenge, assessed the plausibility of the prosecutor's explanation, and found the prosecutor's stated reasons to be credible.   We find no clear error in the trial court's determination.

**{¶ 49}** Smith's first assignment of error is overruled.

### III. Exclusion of Evidence about Victim

{¶ 50} In his second assignment of error, Smith claims that the trial court committed reversible error by excluding certain testimony from Smith regarding Isaiah's propensity for violence and specific acts of violence by Isaiah. Smith asserts that the evidence regarding Isaiah's character was admissible under Evid.R. 404(A)(2) and that the evidence regarding Isaiah's specific acts of violence was admissible under Evid.R. 405(B). Smith further asserts that the testimony was relevant to his claim of self-defense.

{¶ 51} Relevant evidence is generally admissible whereas irrelevant evidence is not. Evid.R. 402. "Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Relevant evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Evid.R. 402; Evid.R. 403(A).

{¶ 52} Evid.R. 404 addresses character evidence. Evid.R. 404(A) provides, in part:

(A) Character Evidence Generally. Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, subject to the following exceptions:

* * *

(2) Character of Victim. Evidence of a pertinent trait of character of the victim

of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor is admissible; * * *.

**{¶ 53}** Evid.R. 405 further provides:

(A) Reputation or Opinion. In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

(B) Specific Instances of Conduct. In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct.

**{¶ 54}** A trial court has broad discretion to admit or exclude evidence, and its exercise of that discretion will not be disturbed on appeal absent an abuse of discretion. *State v. Norris*, 2d Dist. Montgomery No. 26147, 2015-Ohio-624, ¶ 14. "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34.

**{¶ 55}** Prior to King's testimony, the trial court and counsel had an extensive discussion about the admissibility of evidence regarding Isaiah's prior wrongful acts. Defense counsel indicated that King would testified that, during the robbery of King and Smith, Isaiah told them, "You already know what I did to Devo," referring to a person who had been murdered a year before the robbery. Counsel indicated that King had also

heard that Isaiah had killed multiple people, and that King would testify that he (King) and Smith spoke at length about Isaiah's reputation for violence. Defense counsel argued that Smith would have known about these other events to the same degree as King.

**{¶ 56}** The trial court disallowed King's proposed testimony, indicating that "Dontay King can talk about his own state of mind but he can't talk about the state of mind of another person"; Smith alone could talk about his own state of mind. (Trial Tr. at 286.) The court further emphasized that Smith's and King's experience with Isaiah during the robbery provided strong evidence that Smith might have a reasonable belief that he was in imminent danger of death or great bodily harm from Isaiah. The court found, in contrast, that vague allegations that Isaiah had harmed others and was dangerous would "invite the jury to go on a detour." In other words, the court found that the probative value of that evidence was substantially outweighed by the danger of confusing the issues. (Trial Tr. at 290-291.)

**{¶ 57}** The issue arose again prior to Smith's testimony in his own defense. The court ruled:

All right. I maintain my ruling made earlier in the case that using Evidence Rule 403 as my baseline, I do not find that such evidence is admissible. The only purpose for such evidence would be to indicate that Shawn Smith had a justifiable fear of Isaiah Smith during the events in question. In fact, the evidence in the case to this point, I expect it to be reinforced here in a few moments, is that Isaiah Smith perpetrated a robbery upon the persons of Dontay King and Shawn Smith, at gunpoint; that in the course of that robbery he even went to the extent of pointing his gun at the

head of Dontay King, squeezed the trigger of the gun and fortunately for Dontay King, the gun did not fire. That evidence, in my mind[,] is abundant and clear in creating a justifiable fear on the part of both Shawn Smith and Dontay King that I'd say Smith was a dangerous person unto a threat of death; a threat to life, on the part of Isaiah Smith.

So I think evidence as to his character and propensity to violence on other occasions is miniscule in terms of its probative value and compared to what's already clear in the record and I think the admission of that evidence would cause confusion of the issues which under Evidence Rule 403(A), requires the court to preclude the evidence.

I think it also leads to a cumulative presentation which under 403(B) permits me on a discretionary basis to preclude the evidence. I elect to do both. I will not permit the evidence.

(Trial Tr. at 860-861.)

**{¶ 58}** We find no abuse of discretion in the trial court's ruling. For purposes of Smith's claim of self-defense, Smith was required to demonstrate that he "had a bona fide belief that he was in imminent danger of bodily harm." *E.g., State v. Brown*, 2017-Ohio-7424, 96 N.E.3d 1128, ¶ 24 (2d Dist.). The trial court reasonably concluded that Isaiah's (undisputed) robbery of Smith and King -- in which Isaiah pointed a gun at King and pulled the trigger, and then subsequently shot at King's vehicle as King drove away – strongly demonstrated both Isaiah's dangerousness and Smith's justifiable fear of Isaiah. The court further reasonably concluded that additional information about Isaiah's reputation in the community and his claim of responsibility for the death of another individual would

have provided little additional benefit to Smith, but would have invited the jury to "detour" into unrelated crimes by Isaiah.

{¶ 59} Smith's second assignment of error is overruled.

### IV. Admission of Unindicted Actions by Smith

{¶ 60} In his third assignment of error, Smith claims that the trial court erred in admitting testimony regarding "irrelevant, unindicted conduct" by him. Specifically, he argues that evidence that he was in a vehicle that fired shots into Hicks's residence was not relevant and was inadmissible under Evid.R. 402. Alternatively, Smith argues that, even if the evidence were relevant, the probative value was substantially outweighed by the danger of undue prejudice, confusion of the jurors, or misleading the jurors, particularly as to Count Nine, which related to discharging a firearm upon or over a public road.

{¶ 61} Evid.R. 404(B) provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The Ohio Supreme Court has discussed Evid.R. 404, stating:

Evid.R. 404 codifies the common law with respect to evidence of other acts of wrongdoing. The rule contemplates acts that may or may not be similar to the crime at issue. If the other act is offered for some relevant purpose other than to show character and propensity to commit crime, such as one of the purposes in the listing, the other act may be admissible. Another consideration permitting the admission of certain other-acts evidence is

whether the other acts "form part of the immediate background of the alleged act which forms the foundation of the crime charged in the indictment" and are "inextricably related" to the crime.

(Citations omitted.) *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 13.

{¶ 62} Courts employ a three-step analysis to determine whether to admit other-acts evidence:

The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Evid.R. 401. The next step is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B). The third step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice. See Evid.R 403.

*State v. Hare*, 2018-Ohio-765, __ N.E.3d __, ¶ 42 (2d Dist.), citing *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 20.

{¶ 63} At the outset, Smith did not object to the admission of testimony that he shot at Hicks's residence or, as he claims, was present in the car when King shot at Hicks's residence. Accordingly, Smith has waived all but plain error. In order to constitute plain error, the error must be an obvious defect in the trial proceedings, and the error must

have affected substantial rights. *State v. Norris*, 2d Dist. Montgomery No. 26147, 2015-Ohio-624, ¶ 22; Crim.R. 52(B). Plain error should be noticed "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus; *State v. Singleton*, 2d Dist. Montgomery No. 26889, 2016-Ohio-5443, ¶ 45.

{¶ 64} King testified that, after he and Smith were robbed by Isaiah, they drove to and briefly stopped at Smith's residence. (Smith testified that this was his uncle's residence.) According to King, after they got back into the car, they drove back to the area where the robbery had occurred, and Smith directed King to a residence (Hicks's house); Smith told King that Isaiah would be there. King testified that Smith then directed King to pull over, and Smith shot at the house several times from the vehicle.

{¶ 65} Although Smith was not indicted for firing his gun at the residence, the incident was intricately related to the multiple encounters between Smith, King, and Isaiah between 4:10 and 4:30 p.m. on January 14, 2016. Most significantly, if King's testimony were believed, the jury could have reasonably concluded that Smith and King were looking for Isaiah and seeking revenge when they later engaged in gunfire in front of Isaiah's mother's residence and on Gettysburg. Moreover, King's testimony that Smith shot at Hicks's residence undermined Smith's own testimony that he simply shot at Isaiah in self-defense and would not otherwise fire his weapon. In short, the State's evidence was directly related to Smith's intent when he fired the shots that wounded Isaiah and Hicks and killed Elijah, and we find nothing to suggest that the jury could have been or was confused or misled by this evidence. The trial court did not abuse its discretion in permitting evidence regarding the shooting of Hicks's home.

{¶ 66} Smith's third assignment of error is overruled.

## V. Conclusion

{¶ 67} The trial court's judgment will be affirmed.

. . . . . . . . . . . .

DONOVAN, J. concurs.

HALL, J., concurring:

{¶ 68} I fully agree with Judge Froelich's analysis and opinion for the court. With respect to the trial court's handling of the *Batson* challenge, I agree that the trial court effectively ruled on the third prong of the *Batson* procedure when it stated: "I overrule the Batson challenge. I think the state has articulated a race-neutral reason." This is despite the ambiguity noted about whether the court was ruling on the first *Batson* prong, a prima-facie showing of a race-based peremptory jury strike, or the third *Batson* prong of whether purposeful racial discrimination was proven.

{¶ 69} I write separately to articulate that on this record it matters not whether we determine that the trial court effectively ruled on the third *Batson* prong. This is because if we were to conclude the trial court did *not* rule on the third prong, then the first prong is not moot. In my opinion, the trial court correctly ruled on the first prong by stating that "the defense has not made a prima facie showing that the prosecutor has exercised that peremptory challenge on their basis of race." I emphasize part of the quote from *Hernandez v. New York*, at ¶ 33 herein, that "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges *and the trial court has ruled on the ultimate question of intentional discrimination*, the preliminary issue of whether the

defendant had made a prima facie showing becomes moot." *Hernandez,* 500 U.S. at 359, 111 S.Ct. 1859, 114 L.Ed.2d 395; *see also State v. White*, 85 Ohio St.3d 433, 437, 709 N.E.2d 140 (1999). It is only upon a court's ruling on the ultimate third-prong question of whether there is purposeful discrimination that the first-prong issue of a prima facie showing becomes moot. Consequently, if we conclude here that the trial court *did not* rule on the third *Batson* prong, then the ruling on the first prong is not moot and is subject to review.

**{¶ 70}** As indicated, the trial court concluded that there was no prima facie showing of discrimination. I see no evidence or inference that can be drawn to the contrary. Accordingly, if we had not decided that the trial court effectively ruled on prong three, the result would be the same because there is no error in the trial court's ruling on prong one.


Copies mailed to:

Mathias H. Heck
Andrew T. French
J. David Turner
Hon. Michael W. Krumholtz