[Cite as *State v. Rodgers*, 2023-Ohio-734.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. Nos. 29403; 29405 |
| | : | |
| v. | : | Trial Court Case Nos. 2019 CR 03832; |
| | : | 2020 CR 00237 |
| LARRY DWAYNE RODGERS | : | |
| | : | (Criminal Appeal from Common Pleas |
| Appellant | : | Court) |
| | : | |

· · · · · · · · · ·

O P I N I O N

Rendered on March 10, 2023

· · · · · · · · · ·

MATHIAS H. HECK, JR., by ELIZABETH A. ELLIS, Attorney for Appellee

TRAVIS L. KANE, Attorney for Appellant

· · · · · · · · · · · ·

WELBAUM, P.J.

{¶ 1} Appellant, Larry Dwyane Rodgers, appeals from his convictions in the Montgomery County Court of Common Pleas after a jury found him guilty of multiple counts of aggravated murder, felony murder, kidnapping, felonious assault, involuntary manslaughter, having weapons while under disability, and related firearm specifications.

In support of his appeal, Rodgers claims that the trial court erred by failing to suppress evidence obtained as a result of law enforcement's constructively entering his residence to arrest him without a warrant. Rodgers also claims that the trial court erred by certifying four witnesses as experts in front of the jury and by permitting the admission of other-acts evidence in violation of Evid.R. 404(B). Lastly, Rodgers claims that all of his convictions were against the manifest weight of the evidence. For the reasons outlined below, we disagree with Rodgers' claims and will affirm the judgments of the trial court.

**Facts and Course of Proceedings**

{¶ 2} On December 2, 2019, a Montgomery County grand jury returned an indictment in Case No. 2019 CR 03832 charging Rodgers with one count of having weapons while under disability in violation of R.C. 2923.13(A)(2), a felony of the third degree. The charge arose after Dayton Police officers executed a search warrant for an apartment inhabited by Rodgers at 632 Groveland Avenue and discovered several items of contraband, including a .40 caliber firearm in Rodgers' bedroom closet.

{¶ 3} The search of 632 Groveland Avenue was conducted as part of a homicide investigation, the culmination of which resulted in Rodgers' separate indictment in Case No. 2020 CR 00237 for several charges related to the deaths of 28-year-old Todd Burkhart, 20-year-old Kyla Hayton, and the unborn child that Hayton was carrying. The indicted charges and associated firearm specifications in Case No. 2020 CR 00237 are listed below along with the corresponding victim.

Victim: Todd Burkhart

1. **Kidnapping (purpose to commit a felony)**
   R.C. 2905.01(A)(2), felony of the first degree with a firearm specification

2. **Kidnapping (purpose to terrorize/cause serious physical harm)**
   R.C. 2905.01(A)(3), felony of the first degree with a firearm specification

3. **Felonious assault (deadly weapon)**
   R.C. 2903.11(A)(2), felony of the second degree with a firearm specification

4. **Felonious assault (serious physical harm)**
   R.C. 2903.11(A)(1), felony of the second degree with a  firearm specification

5. **Aggravated murder (kidnapping - purpose to commit a felony)**
   R.C. 2903.01(B), unclassified felony with a firearm specification

6. **Aggravated murder (kidnapping - purpose to terrorize/cause serious physical harm)**
   R.C. 2903.01(B), unclassified felony with a firearm specification

7. **Felony murder (felonious assault - deadly weapon)**
   R.C. 2903.02(B), unclassified felony with a firearm specification

8. **Felony murder (felonious assault - serious physical harm)**
   R.C. 2903.02(B), unclassified felony with a firearm specification

Victim: Kyla Hayton

9. **Kidnapping (purpose to commit a felony)**
   R.C. 2905.01(A)(2), felony of the first degree with a firearm specification

10. **Kidnapping (purpose to terrorize/cause serious physical harm)**
    R.C. 2905.01(A)(3), felony of the first degree with a firearm specification

11. **Felonious assault (deadly weapon)**
    R.C. 2903.11(A)(2), felony of the second degree with a firearm specification

12. **Felonious assault (serious physical harm)**
R.C. 2903.11(A)(1), felony of the second degree with a firearm specification

13. **Aggravated murder (kidnapping - purpose to commit a felony)**
R.C. 2903.01(B), unclassified felony with a firearm specification

14. **Aggravated murder (kidnapping - purpose to terrorize/cause serious physical harm)**
R.C. 2903.01(B), unclassified felony with a firearm specification

15. **Felony murder (felonious assault - deadly weapon)**
R.C. 2903.02(B), unclassified felony with a firearm specification

16. **Felony murder (felonious assault - serious physical harm)**
R.C. 2903.02(B), unclassified felony with a firearm specification

Victim: Kyla Hayton's Unborn Child

17. **Involuntary manslaughter (felonious assault - deadly weapon)**
R.C. 2903.04(A), felony of the first degree with a firearm specification

18. **involuntary manslaughter (felonious assault - serious physical harm)**
R.C. 2903.04(A), felony of the first degree with a firearm specification

Victim: Other

19. **Having weapons while under disability**
R.C. 2923.13(A)(2), felony of the third degree

{¶ 4} Rodgers pled not guilty to all the indicted charges in Case Nos. 2020 CR 00237 and 2019 CR 03832. In each case, Rodgers filed a motion to suppress the evidence obtained during the search of 632 Groveland Avenue. In Case No. 2020 CR 00237, Rodgers also sought to suppress evidence stemming from his arrest. Specifically, Rodgers argued that his arrest violated the Fourth Amendment because it

had been conducted at the doorway to his private residence without a warrant or probable cause. The trial court held suppression hearings on May 28, 2020, and October 6, 2020. Following those hearings, the trial court issued a decision on January 18, 2022, overruling Rodgers' motions to suppress in their entirety.

{¶ 5} After the trial court overruled Rodgers' motions to suppress, Rodgers' case proceeded to a six-day jury trial. During trial, the State called 28 witnesses and presented over 200 exhibits for the jury to consider. The following is a summary of the testimony and evidence that was presented at trial.

*The Victims' Relationship to Each Other and Rodgers*

{¶ 6} In November 2019, Todd Burkhart and Kyla Hayton lived together as a couple in Mansfield, Ohio, with Hayton's six-year-old daughter. At that time, Hayton was five months pregnant with Burkhart's child. Burkhart and Rodgers knew each other from prison and were associated with a criminal gang known as the Bloods. Between November 5 and 16, 2019, Burkhart and Rodgers exchanged several messages over Facebook Messenger, with Rodgers using the handle "Backwoods ON Wildwood."

*Facebook Messenger Communications Between Rodgers and Burkhart*

{¶ 7} The State presented several messages from Burkhart's Facebook account at trial. *See* State's Exhibit No. 167(A). The messages established that Rodgers had contacted Burkhart on November 5, 2019, to see if Burkhart could sell him some marijuana in time for a birthday party that Rodgers was throwing himself. After

exchanging several messages, on November 13, 2019, Burkhart and Rodgers agreed that Burkhart would drive to Dayton and provide Rodgers with a pound of marijuana on Saturday, November 16, in exchange for $1,500 and an assault rifle. In addition, Burkhart and Rodgers agreed that if Rodgers liked the pound of marijuana provided, Burkhart would drive back to Dayton the next day and provide Rodgers with an additional pound.

{¶ 8} On Friday, November 15, 2019, Burkhart sent a message to Rodgers confirming their meeting in Dayton on November 16. Burkhart also advised Rodgers that his wife and daughter would be joining him and asked Rodgers for his address. In response, Rodgers sent Burkhart a message advising him that his address was 910 Stewart Street.

{¶ 9} At 11:34 a.m. on November 16, 2019, Burkhart messaged Rodgers that he would be leaving for Dayton in about 10 minutes. In response, Rodgers sent Burkhart a message telling him that he had just gotten home and would stay there and wait for Burkhart to arrive. Burkhart thereafter sent a message to Rodgers advising him that his GPS indicated that it would take him two hours and twelve minutes to get to Dayton. A short time later, Rodgers sent Burkhart a message at 12:03 p.m. instructing Burkhart to park in a parking lot behind his house. Rodgers also sent Burkhart a photograph showing the house at 910 Stewart Street and the parking lot where Burkhart was supposed to park.

{¶ 10} At 2:14 p.m., Burkhart sent a message advising Rodgers that he accidentally went to East Stewart Street as opposed to West Stewart Street and that he

was just five minutes away.   Rodgers then sent a message to Burkhart that said "park in back by broke down buick."   At 2:19 p.m., Burkhart messaged Rodgers: "Come outside." This was the last message that Burkhart ever sent.   At 3:59 p.m., almost two hours later, Rodgers sent Burkhart a message saying: "[W]here you go, bro? My dad just pulled up with the money."

*Missing Persons Investigation*

{¶ 11} Hayton's mother, Denise Humrichouser, testified that on Friday, November 15, 2019, she picked up Hayton's daughter (her granddaughter) from Mansfield for a weekend sleepover at her house in Columbus.   Humrichouser testified that she did not know where Hayton was going that weekend.   The last time Humrichouser ever spoke with Hayton was during a Facetime chat they had on Saturday, November 16 at approximately 11 a.m.   Humrichouser testified that she had called Hayton several times on Sunday, November 17, but received no answer.   When Hayton did not return home as planned, Humrichouser contacted the Mansfield Police Department on Monday, November 18, and reported Hayton missing.

{¶ 12} Burkhart's sister, Courtney Burkhart ("Courtney"), reported Burkhart missing on November 18 as well.   Prior to that, Courtney had received a telephone call from Burkhart's best friend advising her that Burkhart was not where he was supposed to be.   Courtney testified that no one had spoken with Burkhart since November 15 and that both Burkhart's and Hayton's cell phones were going directly to voicemail.   In an effort to find the couple, Courtney testified that she contacted several people and did

some research on Facebook. In doing so, Courtney learned that Burkhart had been communicating with someone known as "Backwoods ON Wildwood." Courtney testified that she had determined from Facebook that "Backwoods ON Wildwood" was Larry Rodgers, someone she had never met. Courtney reported all of this information to the police.

{¶ 13} Also on November 18, the Dayton Police Department received an anonymous complaint regarding a vehicle that had been left in the area of 910 West Stewart Street. Officer Justin Hayes responded to the complaint and located a silver Toyota Corolla parked in a parking lot where a housing development used to be. Ofc. Hayes testified that the vehicle was locked and that the driver-side window had been smashed out. Ofc. Hayes ran the vehicle's registration at the scene and determined that the vehicle was registered to Brent Hayton, who was later determined to be Hayton's father. Because the missing person reports on Burkhart and Hayton had not yet been prepared, and because the vehicle had not been reported stolen, did not have expired plates, and was not in violation of any parking policy, Ofc. Hayes simply documented what he saw and left the vehicle where it was parked.

{¶ 14} On November 19, 2019, Courtney reported to the police that she had learned that Burkhart and Hayton had been traveling to Dayton to deliver a package in exchange for a firearm. Courtney testified that she told the police that Burkhart had been shown pictures of a firearm for which he was asked to find a buyer. In addition, Courtney, who lived in Ashland, testified that she had previously lived in Dayton and was aware that Wildwood was the name of a road there. As a result, Courtney contacted her ex-

girlfriend from Dayton, Ruby Arden, and asked Arden to drive to the area of Wildwood Avenue to see if she could locate Burkhart and Hayton's vehicle. Courtney testified that she had provided Arden with a photograph of the vehicle and its license plate number.

{¶ 15} Arden testified that on November 20, 2019, she went to the area of Wildwood Avenue and Stewart Street to look for Burkhart and Hayton's vehicle per Courtney's request. Arden testified that after she drove around the area, she observed a vehicle parked by itself in an empty parking lot near some vacant houses; the vehicle matched the vehicle that Courtney was looking for. After Arden found the vehicle, Courtney called the Mansfield Police Department and Arden called 9-1-1 to report the location of the vehicle.

{¶ 16} Officer Clint Evans of the Dayton Police Department testified that he went to the area of Wildwood Avenue and Stewart Street in response to Arden's 9-1-1 call. Ofc. Evans testified that he took photos of the vehicle at the scene, and he observed that the vehicle had a broken window and looked as if it had been there for at least a couple of days. Ofc. Evans testified that he did not immediately tow the vehicle because it was on private property and was not associated with a definitive crime. However, Ofc. Evans testified that he re-evaluated that decision after speaking with Burkhart's sister, Courtney, who advised him that Burkhart and Hayton had been traveling to Dayton to purchase a firearm from someone known as "Backwoods ON Wildwood." After receiving that information, Ofc. Evans decided to tow the vehicle to a local tow yard where it was later processed and photographed by an evidence technician.

{¶ 17} After the vehicle was towed, Ofc. Evans researched the nickname

"Backwoods ON Wildwood" on the Ohio Law Enforcement Gateway database. Ofc. Evans determined that "Backwoods ON Wildwood" was associated with the name Larry Rodgers. Ofc. Evans testified that he ran the name Larry Rodgers through various databases, including the Montgomery County Auditor's website and JusticeWeb. In doing so, Ofc. Evans determined that the name Larry Rodgers was associated with three properties on Wildwood Avenue: the first property was a vacant lot; the second property was a vacant, dilapidated house; and the third property—1157 Wildwood Avenue—was an occupied residence. Ofc. Evans testified that he went to 1157 Wildwood Avenue and knocked on the door, but no one answered.

{¶ 18} Following the discovery of the vehicle at 910 West Stewart Street, the missing persons case was transferred from Mansfield to Dayton. Continuing with the investigation, Dayton officers went back to the residence at 1157 Wildwood Avenue on November 22, 2019. Detective Zachariah Hastings testified that he was one of the officers who went to the residence, and he recalled entering the residence through an open side door. Det. Hastings testified that he had entered the residence for purposes of conducting a welfare check, as he had hoped to find Burkhart and Hayton inside. However, no one was found inside the residence.

*Discovery of Burkhart's Body and Other Evidence*

{¶ 19} The officers continued their investigation on November 22 by conducting a search of the area around 1157 Wildwood Avenue. In doing so, an officer discovered a cell phone with a shattered screen in a field behind the residence. Using the cell phone's

serial number, the officers were able to determine that the cell phone belonged to Burkhart. After Burkhart's cell phone was found, another officer discovered a black cell phone case, a purse, various items of personal property, and a wallet containing Hayton's identification cards.

{¶ 20} Officer Bryan Camden testified that, after the aforementioned evidence was discovered, he checked an abandoned house at 900 West Stewart Street and discovered Burkhart's body inside. The evidence technician who processed the scene testified to collecting five 9-millimeter Lugar shell casings that were FC (Federal Cartridge) in brand around the area of Burkhart's body.

{¶ 21} The coroner who examined Burkhart's body testified that Burkhart had sustained six gunshot wounds and that his cause of death was due to the multiple gunshot wounds. More specifically, the coroner testified that Burkhart had been shot in his left forearm, right lower leg, abdomen, right upper chest, posterior neck, and head. The coroner testified that a large amount of blood—1.5 liters—accumulated in Burkhart's right chest. The coroner explained that because the heart stops pumping blood after death, the large accumulation of blood in the chest indicated that Burkhart had been alive a minute or two after being shot in the chest. In contrast, the coroner testified that the shot to Burkhart's head would have caused Burkhart's death in a matter of seconds. Accordingly, the coroner testified that the gunshot to Burkhart's head was fired after Burkhart was shot in the chest.

*Locating Rodgers at 632 Groveland Avenue*

{¶ 22} After Burkhart's body was discovered, lead homicide detective Zachary Williams directed officers to go back and monitor 1157 Wildwood Avenue. Upon doing so, the officers ran into an occupant of the residence, Laquita Phillips. Det. Williams testified that after being alerted to Phillips' presence, he went to 1157 Wildwood Avenue and spoke to Phillips about Rodgers; Phillips provided Williams with Rodgers' cell phone number. Rodgers' cell phone was thereafter pinged and determined to be located in an apartment complex on Groveland Avenue in Dayton.

{¶ 23} Detective David House testified that he responded to the apartment complex at Groveland Avenue following the cell phone ping. When he got to the apartment complex, Det. House observed a maroon Buick that matched the description of a vehicle that Rodgers was known to drive. Det. House ran the vehicle's license plate and discovered that the vehicle was registered to Alicia Williams, who was later identified as Rodgers' girlfriend.

{¶ 24} After obtaining information about the Buick, Det. House knocked on the door to the apartment located at 634 Groveland Avenue. Det. House testified that a woman in apartment 632 Groveland Avenue ended up opening her door and speaking with him. Det. House testified that he asked the woman if she was Alicia Williams, and she responded affirmatively. Det. House testified that he told Alicia Williams that he was looking for Rodgers, and she advised him that Rodgers was upstairs.

{¶ 25} After learning that Rodgers was inside the apartment, Det. House announced himself as a Dayton Police officer and yelled for Rodgers to come downstairs. Det. House testified that Rodgers complied with his order and was thereafter placed in

custody. Rodgers was transported to the police department's safety building for questioning. The officer who transported Rodgers testified that he had emptied Rodgers' pockets and taken Rodgers' cell phone before placing Rodgers inside his cruiser. The officer also testified to providing Det. Williams with Rodgers' cell phone.

{¶ 26} Det. House further testified that, after Rodgers was taken into custody, he and another detective went inside 632 Groveland Avenue to conduct a protective sweep of the residence. Det. House testified that the protective sweep was performed for officer safety and to make sure that Hayton was not in danger. During the sweep, the officers did not find Hayton, but they did observe small bags of marijuana next to a bed and a large bag of marijuana and a gun box in a bedroom closet. Thereafter, the officers obtained and executed a search warrant for the apartment.

{¶ 27} During the execution of the search warrant, an officer opened the gun box in the bedroom closet and discovered a magazine loaded with 14 9-millimeter Lugar rounds that were Federal Cartridge in brand. There was also one 9-millimeter round of the same brand found loose in the gun box. Also inside the gun box was a full box of ammunition for a .40 caliber Smith and Wesson firearm and nine rounds of the same caliber loose in the gun box. In addition to the ammunition, an officer discovered a .40 caliber Smith and Wesson semi-automatic handgun loaded with 21 rounds.

{¶ 28} A search warrant was also obtained and executed for the residence at 1157 Wildwood Avenue. During the execution of that warrant, an officer searched a drawer and found one 9-millimeter Lugar round that was Federal Cartridge in brand and one .40 caliber Smith and Wesson round.

*Discovery of Hayton's Body*

{¶ 29} The Dayton Police Department's search for Hayton continued until November 25, 2019. On that day, Officers Chad Jones and Jason Lagore went to the area of Wildwood Avenue and Stewart Street with Ofc. Lagore's specially-trained cadaver dog. Ofc. Jones testified that the cadaver dog conducted a free air sniff and was led to a vacant house at 910 West Stewart Street. Ofc. Jones testified that he knocked and announced his and Ofc. Lagore's presence and that, upon doing so, the door to the residence fell open. Ofc. Jones testified that as the door opened, the cadaver dog rushed inside the residence and alerted to a body therein.

{¶ 30} After the dog alerted, Ofc. Jones went inside 910 West Stewart Street and observed the body of a small female who was later identified as Hayton. Ofc. Jones also observed bullet holes in the wall, blood, and shell casings lying in the area of Hayton's body. The evidence technician who processed the scene testified to collecting 12 9-millimeter Lugar shell casings that were Federal Cartridge in brand.

{¶ 31} The coroner who examined Hayton's body testified that Hayton had sustained 12 gunshot wounds and that her cause of death was due to the multiple gunshot wounds. More specifically, the coroner testified that Hayton had been shot multiple times in her arms and chest and had one gunshot to her head. The coroner also testified that Hayton had 1.7 liters of blood accumulated in her chest, which the coroner indicated would have taken a number of minutes to accumulate. Accordingly, the coroner testified that Hayton was still alive after sustaining the gunshot wounds to her chest and that the

gunshot to her head would have been the wound inflicted at the time of her death. The coroner further testified that Hayton had been carrying a male fetus that died as a result of her death.

*Interview of Rodgers*

**{¶ 32}** Det. Williams testified that he interviewed Rodgers after Rodgers was taken into custody. The interview was video-recorded and admitted into evidence as State's Exhibit 165. During the interview, Rodgers told Det. Williams that he and Burkhart had known each other from Mansfield prison and that they had since connected with each other over Facebook. Rodgers also advised Det. Williams that his Facebook handle was "Backwoods ON Wildwood" and that he had grown up on Wildwood Avenue. Rodgers further indicated that he had been aware that Burkhart was coming to Dayton on Saturday, November 16, to buy marijuana and a rifle. Rodgers, however, claimed that Burkhart was getting those items from another person. According to Rodgers, he and Burkhart were supposed to meet each other at the United Dairy Farmers on Brown Street after Burkhart obtained the marijuana and rifle. Rodgers told Det. Williams that he had been meeting with Burkhart in order to buy some Percocet pills from him. Rodgers, however, claimed that Burkhart never showed up to their meeting and that he never saw Burkhart or Hayton on November 16.

*Cell Phone Location Data and Other Location Information*

**{¶ 33}** On November 22, 2019, Sergeant Thomas Cope prepared an exigent-

circumstances warrant for Burkhart's and Hayton's cell phone location data. Sgt. Cope testified that after providing the warrant to the cell phone companies, he was informed that Burkhart's and Hayton's cell phones were no longer operable and that only historical location data could be provided. The historical location data, however, tracked Burkhart and Hayton's movements from Mansfield to Dayton on Saturday November 16 and confirmed that they had been in the area of 900 and 910 West Stewart Street that afternoon.

{¶ 34} Agent Kevin Horan of the FBI Cellular Analysis Survey Team testified that he had analyzed historical location data from Burkhart, Hayton, and Rodgers' cell phones. In doing so, Agent Horan determined that Rodgers had been in the area of 900 and 910 West Stewart Street from 11:45 a.m. until 3:30 p.m. on November 16, 2019. Agent Horan also testified that at 2:30 p.m. that day, Burkhart's, Hayton's, and Rodgers' cell phones were all in the area of 900 and 910 West Stewart Street. In addition, Agent Horan testified that Burkhart's cell phone stopped being active at 2:30 p.m., while Hayton's and Rodgers' phones continued being active at 910 West Stewart Street. Agent Horan further testified that from 2:30 p.m. to 3:30 p.m., Hayton's phone never left the location of 910 Stewart Street, and all outgoing activity from her phone stopped at 2:30 p.m.

{¶ 35} Agent Horan testified that Rodgers' cell phone thereafter traveled to the Fairfield Inn in downtown Dayton at 3:39 p.m. This information coincided with the testimony of Alicia Williams, who testified that Rodgers had picked her up from work on November 16 at the Fairfield Inn using her maroon Buick Century. That information was

also confirmed by video footage from the Fairfield Inn showing Williams being picked up from work in a maroon Buick at 3:39 p.m. on November 16.

{¶ 36} In addition, the State presented video footage recorded from a camera on a Dayton Regional Transit Authority ("RTA") bus that drives by 910 Stewart Street during its route.   In the video, Burkhart and Hayton's silver Toyota Corolla can be seen parked in the parking lot behind 910 West Stewart Street at 3:14 p.m. on November 16.   The video also showed a second vehicle in the parking lot that resembled the maroon Buick Century that Rodgers used to pick up Alicia from work.

*DNA Evidence*

{¶ 37} The gun box, magazine, ammunition, .40 caliber firearm, and the bags of marijuana found at 632 Groveland Avenue were all swabbed for DNA analysis.   As to the gun box, the forensic DNA expert who analyzed the items testified that there was a partial mixed DNA profile from which Rodgers could not be excluded as a possible contributor, meaning that Rodgers' DNA type was present on the gun box.   The DNA expert also testified that there was insufficient DNA collected to make any determination with regard to the ammunition, .40 caliber firearm, and the plastic bags containing the marijuana.

{¶ 38} With regard to the magazine, the DNA expert testified that Rodgers could be excluded as a possible DNA contributor.   The expert, however, testified that this did not necessarily mean that Rodgers never touched the magazine.   More specifically, the expert explained that people do not always leave their DNA behind when they touch

something and that the DNA test results simply indicate that Rodgers was excluded as a contributor of the DNA that was collected from the magazine. The expert also testified that swabs were taken from the 9-millimeter shell casings at the crime scenes, but that no DNA was obtained from the swabs. Accordingly, no DNA testing could be performed on the shell casings.

*Ballistics Evidence*

{¶ 39} An expert firearms examiner testified that the shell casings collected at 900 and 910 West Stewart Street were all 9-millimeter Lugar casings of the same brand, i.e., Federal Cartridge. The firearms examiner also testified to a reasonable degree of scientific certainty that the same firearm fired all the shell casings at both crime scenes. In addition, the firearms examiner testified that the .40 caliber Smith and Wesson firearm found at 632 Groveland Avenue was operable and was not the same firearm used at 900 and 910 West Stewart Street.

*Alleged Letters from "Real Killer"*

{¶ 40} Det. Williams testified that, while in jail, Rodgers received a handwritten letter that was purportedly from the person who killed Burkhart and Hayton. The letter was admitted into evidence as State's Exhibit 169. The alleged author of the letter, Jay Henderson, wrote that he was sorry that Rodgers was being accused of something that he did not do and explained why he had had to kill Burkhart and Hayton. Det. Williams testified that Alicia Williams received a similar letter in the mail from the same alleged

author. The letter sent to Alicia was admitted into evidence as State's Exhibit 170. Also admitted into evidence was a handwritten letter that Rodgers had sent to the trial court around the same time. *See* State's Exhibit 168.

{¶ 41} Det. Williams testified that he sent all three letters to the Ohio Bureau of Criminal Investigation ("BCI") to be analyzed and compared. A forensic scientist from BCI who specializes in handwriting comparisons testified to a reasonable degree of scientific certainty that the handwriting on all three letters was from the same person. The handwriting expert further testified that there were no visible differences between the type of envelopes and paper used for all three letters and that all the envelopes displayed the same pre-printed postal stamp.

{¶ 42} Captain Brad Daugherty, an employee of the Montgomery County Jail where Rodgers was held, testified that the postal stamp in question was the same postal stamp that appeared on all the envelopes distributed at the jail's commissary. Capt. Daugherty also testified that no physical mail is ever delivered to inmates. Rather, Capt. Daugherty explained that all mail is sent to a company in Florida where the mail is scanned and downloaded onto a computer system from which inmates can then access the mail on a kiosk in jail. Despite inmates never having the opportunity to touch the original mail sent to them, a certified latent fingerprint examiner testified that Rodgers' fingerprint was found on the original letter that was sent to him.

*The Jury's Verdict*

{¶ 43} After the foregoing testimony and evidence was presented at trial, the jury

deliberated and found Rodgers guilty of all the indicted counts and specifications in Case Nos. 2020 CR 00237 and 2019 CR 03832. At sentencing, the trial court merged several of the offenses and corresponding firearm specifications. Following the merger, the State elected to have Rodgers sentenced for two counts of aggravated murder and one count of involuntary manslaughter. In addition, Rodgers was sentenced for the corresponding firearm specifications and the two counts of having weapons while under disability. For all those offenses and specifications, the trial court imposed an aggregate term of 72 years to life in prison.

**{¶ 44}** Rodgers now appeals from his conviction, raising four assignments of error for review.

## First Assignment of Error

**{¶ 45}** Under his first assignment of error, Rodgers contends that the trial court erred by failing to grant his motion to suppress. Specifically, Rodgers claims that the evidence stemming from his arrest at 632 Groveland Avenue should have been suppressed because his Fourth Amendment rights were violated by Det. House's constructively entering his residence and arresting him without a warrant. We note that Rodgers is only challenging Det. House's alleged constructive entry into the residence, not the subsequent protective sweep of the residence or whether there was probable cause to arrest him.

*Standard of Review*

{¶ 46} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." (Citation omitted.) *Id.* "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." (Citation omitted.) *Id.* "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." (Citation omitted.) *Id.*

*Fourth Amendment Protections and Exigent Circumstances Exception*

{¶ 47} The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 477-478, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Therefore, "[a]bsent exigent circumstances, police officers may not enter an individual's home or lodging to effect a warrantless arrest or search." *United States v. Morgan*, 743 F.2d 1158, 1163 (6th Cir.1984), citing *Payton* at 590.

{¶ 48} "Exigent circumstances are a well-established exception to the Fourth Amendment's warrant requirement." (Citation omitted.) *State v. Byrd*, 2d Dist.

Montgomery No. 27340, 2017-Ohio-6903, ¶ 13. Entry based on exigent circumstances "is founded on the premise that the existence of an emergency situation, demanding urgent police action, may excuse the failure to procure a warrant." (Citation omitted.) *State v. Burchett*, 2d Dist. Montgomery No. 20166, 2004-Ohio-3095, ¶ 16. "The exigent or emergency circumstances exception to the warrant requirement applies in a variety of situations, including when entry into a building is necessary to protect or preserve life, to prevent physical harm to persons or property, or to prevent the concealment or destruction of evidence, or when officers are in 'hot pursuit' of a fleeing suspect or someone inside poses a danger to the police officer's safety." (Citations omitted.) *Byrd* at ¶ 13.

*Constructive Entry*

{¶ 49} As previously discussed, Rodgers claims that his Fourth Amendment rights were violated because Det. House constructively entered his residence at 632 Groveland Avenue and arrested him without a warrant. A constructive entry occurs when there is no actual physical entry into the dwelling, but there is police conduct that accomplishes the same effect as an actual entry. Dow, "Step Outside, Please": Warrantless Doorway Arrests & the Problem of Constructive Entry, 45 New Eng. L.Rev. 7, 21 (2010), citing *Morgan*, 743 F.2d at 1166. The United States Court of Appeals for the Sixth Circuit has held that "a consensual encounter at the doorstep may evolve into a 'constructive entry' when the police, while not entering the house, deploy overbearing tactics that essentially force the individual out of the home." *United States v. Thomas*, 430 F.3d 274, 277 (6th

Cir.2005). In other words, a constructive entry occurs when a suspect emerges from a home "in response to coercive police conduct." *Morgan* at 1166. Coercive police conduct has been described as " 'such a show of authority that [the] Defendant reasonably believed he had no choice but to comply.' " *Thomas* at 277, quoting *United States v. Saari*, 272 F.3d 804, 809 (6th Cir.2001). Some of the hallmarks of constructive entry include: "(1) drawn weapons; (2) raised voices; (3) coercive demands; or (4) a large number of officers in plain sight." (Citations omitted.) *United States v. Grayer*, 232 Fed.Appx 446, 450 (6th Cir.2007).

{¶ 50} On multiple occasions, the Sixth Circuit has applied the constructive entry doctrine and found arrests outside the arrestee's home to be in violation of the Fourth Amendment where there were no exigent circumstances and where the arresting officers utilized coercive tactics to induce the arrestee's presence outside the home. *See, e.g., Morgan*, 743 F.2d at 1161, 1168 (holding that the defendant's warrantless arrest outside his house was in violation of the Fourth Amendment where the defendant was induced to come outside by coercive police tactics that included the presence of ten police officers surrounding the defendant's house, the defendant's car being blocked by an officer's vehicle, spotlights flooding the defendant's house, and the defendant's being summoned from his house by the officers with the blaring call of a bullhorn); *Saari*, 272 F.3d at 806-807 (holding that the defendant's warrantless arrest outside his apartment was in violation of the Fourth Amendment where the defendant came outside his apartment in response to officers knocking forcefully on his apartment door, announcing they were police, and ordering him to come outside while positioned in front of the only exit to his apartment

with their guns drawn).

{¶ 51} This court, however, is not bound by Sixth Circuit authority and we decline to follow the constructive entry doctrine until it is adopted by the Supreme Court of Ohio or the United States Supreme Court. *State ex rel. Yost v. Volkswagen Aktiengesellschaft*, 2019-Ohio-5084, 137 N.E.3d 1267, ¶ 30 (10th Dist.), quoting *State v. Burnett*, 93 Ohio St.3d 419, 423, 755 N.E.2d 857 (2001) ("Ohio courts are not bound by * * * 'rulings on federal statutory or constitutional law made by a federal court other than the United States Supreme Court,' but we are free to consider the persuasiveness of such decisions"); *State v. Glover*, 60 Ohio App.2d 283, 287, 396 N.E.2d 1064 (1st Dist.1978) ("although we hold the United States Sixth Circuit Court of Appeals in high regard and we find their decisions to be most persuasive, we are not bound to follow the holdings that they articulate").

{¶ 52} Because we decline to follow the constructive entry doctrine, we do not find that the warrantless arrest of Rodgers outside his apartment at 632 Groveland Avenue violated the Fourth Amendment. This is because Rodgers does not dispute that he was arrested outside his residence, and it is well established that "[t]he warrantless arrest of an individual in a public place upon probable cause does not violate the Fourth Amendment." *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 38, citing *United States v. Watson*, 423 U.S. 411, 423-424, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) and *United States v. Santana*, 427 U.S. 38, 42, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976).

{¶ 53} As previously discussed, Rodgers is not arguing on appeal that his arrest was made without probable cause, and we find that any argument to that effect would

indeed fail. " 'Generally, probable cause exists when the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.' " *State v. Crowder*, 2d Dist. Montgomery No. 22344, 2008-Ohio-3708, ¶ 16, citing 26 Ohio Jurisprudence 3d, Criminal Law, Section 646.

{¶ 54} In this case, the record of the suppression hearing establishes that at the time Rodgers was taken into custody, Det. House and the other investigating officers were aware that: (1) Burkhart and Hayton had left Mansfield to meet Rodgers in Dayton and had not been heard from since; (2) Burkhart and Hayton's cell phones became inoperable while in the area of Rodgers' Wildwood Avenue residence; (3) the vehicle that Burkhart and Hayton used to drive to Dayton was found abandoned in the vicinity of Rodgers' Wildwood Avenue residence; (4) multiple items of personal property belonging to Burkhart and Hayton were found near Rodgers' Wildwood Avenue residence; and (5) Burkhart's body was found inside an abandoned house that was located a short distance away from Rodgers' Wildwood Avenue residence. This knowledge was sufficient to warrant a person of reasonable caution in believing that Rodgers had been involved in Burkhart's death and Hayton's disappearance and thus amounted to probable cause.

{¶ 55} Because the officers in this case had probable cause to arrest Rodgers and because we decline to follow the constructive entry doctrine, there was no Fourth Amendment violation with regard to Rodgers' arrest outside his residence at 632 Groveland Avenue. Even if we were to follow the constructive entry doctrine, Rodgers'

argument would still fail because it is not clear from the record of the suppression hearing that Det. House and the other officers at the scene engaged in coercive conduct that constituted a constructive entry. The trial court made the following findings of fact related to that issue, all of which are supported by competent credible evidence in the record:

> While standing outside the threshold of the apartment at 632 Groveland and while talking with Ms. Williams, Det. House stated, "we need to speak with Larry, where is he at?" Ms. Williams stated that Larry was upstairs. Det. House drew his weapon and, while standing outside the residence, and using the screen door as cover, yelled into the house. The stairs in the property were directly in front of the door. Det. House yelled inside, "Larry, Dayton Police, I need you to come down." There were approximately ten police officers around the entirety of the four-unit apartment complex. The officers were situated around the building and not specifically at the two entrances to the unit at 632 Groveland. Det. House remained outside the threshold of the residence as he did not know who was in the residence and, given that a murder investigation was underway, he remained outside in order to retain cover for his safety. From the doorway to the apartment, Det. House observed an adult female and a juvenile female inside the apartment, as well as Ms. Williams. Fifteen to twenty seconds after Det. House yelled for Rodgers to come out, Rodgers stated that he was coming down the stairs. Det. House did not cross the threshold of the property until he observed Rodgers descending the stairs.

After exiting the property Rodgers was taken into custody, handcuffed and placed in a police cruiser.

Decision, Order, and Entry Overruling Motion to Suppress (Jan. 18, 2022), p. 8-9.

{¶ 56} We note that although the trial court found that Det. House had drawn his weapon outside the doorway, there is nothing in the record of the suppression hearing indicating that Rodgers was aware of that fact when he came to the door. There is also nothing in the record of the suppression hearing indicating that Rodgers had been aware that approximately ten police officers were surrounding his apartment complex, and we find it significant that the trial court found that those officers were not specifically at the two entrances to 632 Groveland Avenue. Instead, the record of the suppression hearing simply indicates that Rodgers came to the door and was arrested outside his residence after hearing Det. House call out "Larry, Dayton Police, I need you to come down." In our view, this did not amount to coercive police conduct that would constitute a constructive entry.

{¶ 57} Rodgers' constructive entry argument also fails because even if there had been a constructive entry, there were exigent circumstances justifying Rodgers' warrantless arrest. As previously discussed, the exigent circumstances exception to the warrant requirement "applies in a variety of situations, including when entry into a building is necessary to protect or preserve life, to prevent physical harm to persons or property, or to prevent the concealment or destruction of evidence, or when officers are in "hot pursuit" of a fleeing suspect or someone inside poses a danger to the police officer's safety." *Byrd*, 2d Dist. Montgomery No. 27340, 2017-Ohio-6903, at ¶ 13.

**{¶ 58}** Here, based on what the officers knew about the investigation and because Hayton was still missing, the officers had reason to believe that Rodgers posed a threat to Hayton's life and to the life of the unborn child that she was carrying. Therefore, in an effort to keep Hayton and her child safe, and to prevent Rodgers from escaping or destroying any evidence, instead of waiting for a warrant, Det. House took emergency action and arrested Rodgers at 632 Groveland Avenue.

**{¶ 59}** We note that the "[t]he touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' " *Pennsylvania v. Mimms*, 434 U.S. 106, 108-109, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), quoting *Terry*, 392 U.S. 1 at 19, 88 S.Ct. 1868, 20 L.Ed.2d 889. "An action is 'reasonable' under the Fourth Amendment, regardless of an individual officer's state of mind, "as long as the circumstances, viewed objectively, justify [the] action." " (Emphasis omitted.) *Brigham City, Utah v. Stuart*, 547 U.S. 398, 404, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006), quoting *Scott v. United States*, 436 U.S. 128, 138, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978). In our view, the warrantless arrest at 632 Groveland Avenue was objectively reasonable and justified given the emergency with which the officers were faced. Thus, we find that even if Det. House had engaged in a constructive entry of Rodger's residence, the exigent circumstances exception to the warrant requirement would have applied and excused the warrantless intrusion.

**{¶ 60}** For all the foregoing reasons, we find no Fourth Amendment violation with regard to Rodgers' arrest. Therefore, the trial court did not err by overruling Rodgers'

motion to suppress.

{¶ 61} Rodgers' first assignment of error is overruled.


**Second Assignment of Error**

{¶ 62} Under his second assignment of error, Rodgers contends that the trial court erred by certifying four witnesses as experts in front of the jury. In so arguing, Rodgers is not challenging the credentials of the witnesses in question. Indeed, the record indicates that the witnesses, i.e., Tracy Zehringer, the latent fingerprint examiner; Rebecca Barrett, the forensic handwriting analyst; Russell Uptegrove, the coroner; and Agent Kevin Horan, the cellular phone analyst, were all exceedingly qualified in their fields. Rather, Rodgers argues that the trial court's certification of those experts in front of the jury was prejudicial because it enhanced their stature and gave the appearance of judicial approval of their testimony. We disagree.

{¶ 63} Because Rodgers never objected to the manner in which the witnesses were tendered as experts at trial, he has waived all but plain error for appeal. *State v. Henderson*, 2d Dist. Montgomery No. 28241, 2020-Ohio-6, ¶ 29. "In order for plain error to exist, there must be an obvious defect in the trial proceedings that affected the defendant's substantial rights, meaning that the trial court's error must have affected the outcome of the trial." *State v. Petticrew*, 2d Dist. Clark No. 2022-CA-29, 2023-Ohio-159, ¶ 18, citing *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, ¶ 16. "Courts must proceed on a claim of plain error 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.' " *Henderson* at

¶ 29, quoting *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of syllabus. "The burden of demonstrating plain error is on the party asserting it." *Payne* at ¶ 17.

**{¶ 64}** In support of his claim that the trial court committed plain error by certifying experts in front of the jury, Rodgers relies on *United States v. Johnson*, 488 F.3d 690 (6th Cir.2007). In *Johnson*, the United States Court of Appeals for the Sixth Circuit expressed a preference for trial courts not to designate or certify an expert in the jury's presence. In explaining the reasoning behind this preference, the Sixth Circuit stated that "when a court certifies that a witness is an expert, it lends a note of approval to the witness that inordinately enhances the witness's stature and detracts from the court's neutrality and detachment." *Id.* at 697. Therefore, per *Johnson*, " '[e]xcept in ruling on an objection, the court should not, in the presence of the jury, declare that a witness is qualified as an expert or to render an expert opinion and counsel should not ask the court to do so." *Id.* at 697-698, quoting *ABA Civil Trial Practice Standard 17* (Feb.1998). (Other citations omitted.) The preferred approach discussed in *Johnson* is for the proponent of the witness to pose qualifying and foundational questions and then to proceed with eliciting opinion testimony. *Id.* at 698. If the opponent thereafter objects to the opinion testimony, *Johnson* advises that the court should rule on the objection, allowing the objector to pose voir dire questions to the witness's qualifications if necessary and requested. *Id.*

**{¶ 65}** In *State v. Williams*, 2d Dist. Montgomery No. 27663, 2018-Ohio-1647, this court found the portion of *Johnson* describing the preferred approach for tendering expert

witnesses to be dicta and disagreed with the notion that numerous courts in Ohio had adopted that approach.  *Id.* at ¶ 14-15.   In addition, this court stated the following:

> The custom of tendering a witness as an expert, which by some has been taught as accepted practice, is not without reason.   Since 2001 the Ohio Supreme Court has no less than eight times held that the proponent of an expert does not have to formally tender an otherwise-qualified expert witness.   But those rulings exist for the very reason that appellants have raised the specter of error precisely because the prosecution did not formally tender a witness as an expert.   We also recently considered an argument that ten expert witnesses were not qualified as experts, in part, because they were not formally tendered as experts.   *State v. Hayes*, 2d Dist. Montgomery No. 26379, 2016-Ohio-7241, ¶¶ 113-124.   In addition, once prospective qualifications to render opinions are presented, it makes sense to signal that the qualification portion of the testimony is complete to give the opponent the opportunity to request voir dire of the witness on those qualifications before proceeding with their opinions and to allow the trial court, and the witnesses' proponent, to determine whether the witnesses' opinions will be admissible.   ***The issue, as we perceive it, is more directly related to how a trial court responds to a tender of a witness as an expert***.

(Emphasis added.)   *Id.* at ¶ 13.

**{¶ 66}** In *State v. Foster*, 8th Dist. Cuyahoga No. 90870, 2008-Ohio-31, the Eight

District Court of Appeals found no error where the State offered a witness as an expert in his field and the trial court merely responded "yes" and then overruled the appellant's objection. *Id.* at ¶ 34-35. Specifically, the court in *Foster* found that the trial court "did not expressly declare [the witness] to be an expert" so as to "creat[e] the appearance that the court approved the witness." *Id.* at ¶ 34.

{¶ 67} Relying on *Foster*, this court held in *Williams* that the following statements did not run afoul of *Johnson*:

[Prosecutor]: Judge, at this point, I would tender Dr. Allen as an expert in the field of forensic pathology.

[Defense counsel]: No objection.

THE COURT: So noted.

*Williams* at ¶ 16.

{¶ 68} However, concerning another witness in *Williams*, this court found that the trial court arguably "designated" the witness as an expert contrary to the preferred method in *Johnson* during the following discussion:

[Prosecutor]: Judge, at this time we'd tender Mr. Monturo as an expert in the field of firearms examination and tool marks.

[Defense counsel]: No objection.

THE COURT: He'll be so designated.

*Id.*

{¶ 69} In the present case, when the State offered each of the four witnesses at

issue as experts in their fields, the trial court asked the defense if it had any objections and the defense indicated that it had none. For each of the four witnesses, the trial court thereafter responded by saying one of the following phrases: "Go ahead"; "Okay. Go ahead, [Prosecutor]"; or "All right. Go ahead." Trial Tr. Vols. VII and VIII, p. 1121, 1195, 1227, and 1298.

{¶ 70} Relying on *Foster* and *Williams*, we do not find that the trial court's responses expressly declared or designated the witnesses as experts in front of the jury. When taken in context, the trial court's responses simply acknowledged the defense's lack of an objection and prompted the State to continue questioning the witness. Therefore, we do not find that the trial court's responses lent a note of judicial approval that enhanced the witnesses' stature.

{¶ 71} Moreover, any concern about the appearance of judicial approval of the experts is quelled by the following jury instruction given by the trial court:

Questions have also been asked of an expert witness after he or she has disclosed the underlying facts or data upon which he or she bases his or her opinion. It is for you, the jury, to determine if such facts or data on which the expert based his or her opinion are true and you will determine the weight to give to that evidence.

As with other witnesses, on you alone rests the duty to decide what weight should be given to the testimony of the expert. In determining its weight, consider the expert's skill, experience, knowledge, veracity, familiarity with the facts of the case and the usual rules for testing credibility

or believability of the witness in determining the weight to give to that particular testimony.

Trial Tr. Vol. IX, p. 1488.

{¶ 72} Given the foregoing jury instruction and the innocuous nature of the trial court's responses after the witnesses were offered as experts, we find no error, let alone plain error, with regard to the manner in which the witnesses were tendered as experts at trial.

{¶ 73} Rodgers' second assignment of error is overruled.

## Third Assignment of Error

{¶ 74} Under his third assignment of error, Rodgers contends that the trial court erred by permitting the admission of evidence concerning other crimes, wrongs, or acts in violation of Evid.R. 404(B). Specifically, Rodgers takes issue with the trial court's permitting testimony about him having ties to a criminal gang and to his serving time in prison with Burkhart.

{¶ 75} "Evid.R. 404(B) categorically prohibits evidence of a defendant's other acts when its only value is to show that the defendant has the character or propensity to commit a crime." *State v. Smith*, 162 Ohio St.3d 353, 2020-Ohio-4441, 165 N.E.3d 1123, ¶ 36. Other-acts evidence may, however, be admissible for other non-character-based purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Evid.R. 404(B)(2). "The key is that the evidence must prove something other than the defendant's disposition to commit

certain acts." *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 22. "Thus, while evidence showing the defendant's character or propensity to commit crimes or acts is forbidden, evidence of other acts is admissible when the evidence is probative of a separate, nonpropensity-based issue." *Id.*

**{¶ 76}** Because Rodgers failed to object to the other-acts testimony at issue, he has waived all but plain error with regard to the admission of that testimony. *State v. Wilson*, 2d Dist. Montgomery No. 29349, 2023-Ohio-27, ¶ 58. As previously discussed, plain error exists when there is an obvious defect in the trial proceedings that affected the outcome of the trial. *Petticrew*, 2d Dist. Clark No. 2022-CA-29, 2023-Ohio-159, at ¶ 18, citing *Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, at ¶ 16.

**{¶ 77}** Rodgers first claims that the trial court violated Evid.R. 404(B) by admitting testimony from Burkhart's sister, Courtney Burkhart, stating that Rodgers was associated with the "Bloods street gang." Trial Tr. Vol. III, p. 398. Upon review, we find that this testimony was elicited by Rodgers' trial counsel while cross-examining Courtney. It is well established that a party cannot complain on appeal that the trial court erred in permitting the admission of prejudicial testimony that the party elicited from a witness. *State v. Hare*, 2018-Ohio-765, 108 N.E.3d 172, ¶ 45 (2d Dist.); *State v. Lenoir*, 2d Dist. Montgomery No. 22239, 2008-Ohio-1984, ¶ 24. This is because any error in admitting the testimony was invited, and "[u]nder the doctrine of invited error, '[a] party will not be permitted to take advantage of an error [that] he himself invited or induced.' " *State v. Breneman*, 2d Dist. Champaign No. 2019-CA-23, 2020-Ohio-4151, ¶ 48, quoting *State v. Fair*, 2d Dist. Montgomery No. 24388, 2011-Ohio-4454, ¶ 69; *Hare* at ¶ 45; *Lenoir* at ¶ 24.

Therefore, Rodgers has failed to demonstrate plain error with regard to the criminal gang testimony that Rodgers' trial counsel elicited from Courtney.

{¶ 78} Rodgers also claims that the trial court violated Evid.R. 404(B) by allowing Ofc. Evans and Det. Williams to testify about Burkhart and him serving time in prison together. Upon review, we find that the testimony in question was offered for the limited purpose of showing how Rodgers and Burkhart knew each other and for purposes of discussing the contents of the letters that were admitted into evidence. We also note that Ofc. Evans did not even mention Rodgers by name when testifying about the prison time, as he simply stated the following:

When we spoke with [Burkhart's] sister, she informed me that [Burkhart and Hayton] had actually made the intention to come directly to Dayton with a large amount of money in order to purchase a firearm from somebody that, I believe, Burkhart * * * knew in prison.

Trial Tr. Vol. III, p. 427.

{¶ 79} Moreover, the record establishes that Rodgers' counsel specifically told the jury during opening statement that Rodgers and Burkhart knew each other because they were "old prison buddies." Trial Tr. Vol. III, p. 332. Thus, we fail to see how similar testimony from Ofc. Evans and Det. Williams was prejudicial when Rodgers himself had admitted that he knew Burkhart from prison.

{¶ 80} As a further matter, the trial court instructed the jury not to use the testimony about Rodgers and Burkhart's serving time in prison together as evidence of Rodgers' character. *See* Trial Tr. Vol. IX, p. 1489-1490. Upon review, we find nothing in the

record indicating that the jury failed to heed that instruction. A finding of plain error cannot be based on a mere speculation that the testimony at issue was misused by the jury. *See State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 108 (finding no plain error when the accused's claim "is totally speculative"); *State v. Sanders*, 92 Ohio St.3d 245, 265, 750 N.E.2d 90 (2001) (finding no plain error where defendant's claim "rests wholly upon speculation" and "it is not clear that the outcome would have been otherwise but for the error"); *State v. Belcher*, 2d Dist. Montgomery No. 24968, 2013-Ohio-1234, ¶ 66 (finding no plain error "because any finding of prejudice would have to rely on speculation"). Moreover, there is nothing in the record indicating that the outcome of the trial would have been different had the other-acts testimony at issue not been given. For all the foregoing reasons, Rodgers has failed to demonstrate plain error with regard to his Evid.R. 404(B) claim.

{¶ 81} Rodgers' third assignment of error is overruled.


**Fourth Assignment of Error**

{¶ 82} Under his fourth assignment of error, Rodgers contends that all of his convictions in Case Nos. 2020 CR 00237 and 2019 CR 03832 were against the manifest weight of the evidence. We disagree.

{¶ 83} "A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12. "When evaluating whether a conviction is against the

manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' "   *State v. Jones*, 2d Dist. Montgomery No. 25724, 2014-Ohio-2309, ¶ 8, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 84} "Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses."   *State v. Adams*, 2d Dist. Greene Nos. 2013 CA 61 and 2013 CA 62, 2014-Ohio-3432, ¶ 24, citing *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997).   "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence."   *Id.,* citing *Wilson* at ¶ 14.   "A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances." *Id.*, citing *Martin* at 175.

{¶ 85} As a preliminary matter, we note that Rodgers is attacking the weight of the evidence as to all 20 counts for which the jury found him guilty.   However, because several of those counts were merged as allied offenses at sentencing, we need not consider all 20 counts when reviewing Rodgers' manifest weight claim.   This is because " '[w]hen a trial court dispatches with a count through merger, any error in the jury's verdict on the merged count is rendered harmless beyond a reasonable doubt.' "   *State v.*

*Stargell*, 2016-Ohio-5653, 70 N.E.3d 1126, ¶ 57 (2d Dist.), quoting *State v. Wolff*, 7th Dist. Mahoning No. 07 MA 166, 2009-Ohio-2897, ¶ 70, citing *State v. Powell*, 49 Ohio St.3d 255, 263, 552 N.E.2d 191 (1990). *Accord State v. Adkins*, 2d Dist. Clark No. 2019-CA-45, 2020-Ohio-3296, ¶ 8. Therefore, this court need only consider the counts for which Rodgers was found guilty and sentenced, i.e., one count of aggravated murder as related to Burkhart, one count of aggravated murder as related to Hayton, one count of involuntary manslaughter as related to Hayton's unborn child, and two counts of having weapons while under disability.

*Aggravated Murder*

**{¶ 86}** As previously discussed, Rodgers was convicted of two counts of aggravated murder under R.C. 2903.01(B), which provides that: "No person shall purposely cause the death of another * * * while committing or attempting to commit * * * kidnapping * * *." The State elected to have Rodgers sentenced on the two counts of aggravated murder that alleged kidnapping under R.C. 2905.01(A)(3), which provides that: "No person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of the other person * * * [t]o terrorize, or to inflict serious physical harm on the victim or another." The term "terrorize" has been defined according to its ordinary and common usage, i.e., "to fill with terror and anxiety." (Citations omitted.) *State v. Myers*, 9th Dist. Wayne No. 21AP0027, 2022-Ohio-991, ¶ 9.

**{¶ 87}** Upon review, we find that the weight of the evidence established that Rodgers purposely caused the death of Burkhart and Hayton by shooting them with a 9-

millimeter firearm. Although there was no direct evidence of this, such as eyewitness testimony or DNA/fingerprint evidence, we find that there was a great amount of circumstantial evidence, which has the same probative value. *See State v. Jenks*, 61 Ohio St.3d 259, 272, 574 N.E.2d 492 (1991), citing *State v. Nicely*, 39 Ohio St.3d 147, 529 N.E.2d 1236 (1988); *State v. St. John*, 2d Dist. Montgomery No. 27988, 2019-Ohio-650, ¶ 49. Some of the circumstantial evidence was as follows:

(1) The Facebook Messenger communications between Rodgers and Burkhart in which they discussed their plan to meet on November 16, 2019, at 910 West Stewart Street—the location where Hayton's body was found;

(2) The cell phone location data placing Rodgers, Burkhart, and Hayton together on the afternoon of November 16, 2019, in the locations where Burkhart and Hayton's bodies were found.

(3) The fact that Burkhart and Hayton were never heard from after being in the same location with Rodgers;

(4) The fact that Burkhart and Hayton were both shot and killed with the same 9-millimeter firearm and that the same brand of 9 millimeter Lugar rounds used in the shootings was found inside Rodgers' residences at 632 Groveland Avenue and 1157 Wildwood Avenue;

(5) The RTA bus video from the afternoon of November 16, 2019, showing that Burkhart and Hayton's vehicle was located in the lot where Rodgers had instructed them to park and that their vehicle was parked next to a vehicle that resembled the maroon Buick Century that Rodgers was driving that

day;

(6) The various items of personal property belonging to Burkhart and Hayton found strewn behind Rodgers' residence at 1157 Wildwood Avenue, which was just a few houses down from where Burkhart's and Hayton's bodies were found;

(7) The fact that Rodgers lied to Det. Williams about where he was supposed to meet Burkhart on November 16, 2019, and about the purpose of the meeting; and

(8) The fact that Rodgers told Det. Williams that he had never met with Burkhart and Hayton on November 16, 2019, when the cellphone location data and RTA video evidence indicated otherwise.

{¶ 88} As for the kidnapping element of aggravated murder, we find that the jury could have reasonably concluded from the evidence that Rodgers killed Burkhart and Hayton after restraining their liberty by force at gunpoint for purposes of terrorizing them and/or inflicting serious physical harm. This is because the coroner testified that the large amount of blood in their chest cavities indicated that both Burkhart and Hayton survived at least a few minutes after being shot in the chest and then died seconds after being shot in the head. Based on that testimony, the jury could have reasonably concluded that Rodgers restrained Burkhart and Hayton's liberty by holding them at gunpoint and by shooting them multiple times. Not only would this have inflicted serious physical harm, but it would have placed Burkhart and Hayton in terror minutes before Rodgers fired the fatal gunshots to their heads.

{¶ 89} Based on the evidence and the reasonable inferences, we do not find that the jury lost its way or created a manifest miscarriage of justice when it found Rodgers guilty of two counts of aggravated murder with firearm specifications. Therefore, we do not find that Rodgers' conviction for those counts and specifications was against the manifest weight of the evidence.

*Involuntary Manslaughter*

{¶ 90} Rodgers was also convicted of one count of involuntary manslaughter under R.C. 2903.04(A), which provides that: "No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony." The State elected to have Rodgers sentenced for the count of involuntary manslaughter that alleged the death of Hayton's unborn child was proximately caused by Rodgers committing felonious assault under R.C. 2903.11(A)(1), which provides that: "No person shall knowingly * * * [c]ause serious physical harm to another or to another's unborn[.]"

{¶ 91} As previously discussed, the weight of the evidence established that Rodgers shot and killed Hayton, which would qualify as serious physical harm. Accordingly, the jury could have reasonably concluded from the evidence that Rodgers committed felonious assault against Hayton. Because the coroner testified that the fetus Hayton was carrying died as a result of Hayton's dying from her gunshot wounds, the jury could have also reasonably concluded that the fetus died as a proximate result of Rodgers' committing the felonious assault against Hayton. Given the coroner's

testimony, we do not find that the jury lost its way or created a manifest miscarriage of justice in finding Rodgers guilty of involuntary manslaughter with a firearm specification. Therefore, we do not find that Rodgers' conviction for that count and specification was against the manifest weight of the evidence.

*Having Weapons While Under Disability*

**{¶ 92}** Rodgers was also convicted of two counts of having weapons while under disability in violation of R.C. 2923.13(A)(2), which provides that: "Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if * * * [t]he person is under indictment for or has been convicted of any felony offense of violence * * *."

**{¶ 93}** In this case, the parties jointly stipulated that Rodgers had previously been convicted of a felony offense of violence in Montgomery C.P. No. 2012 CR 02646. *See* Joint Ex. 3. Accordingly, there was no dispute that Rodgers was under a weapons disability at the time in question. The evidence presented at trial established that Rodgers had been in possession of a .40 caliber Smith and Wesson firearm at 632 Groveland Avenue and that he had used a 9-millimeter firearm to shoot Burkhart and Hayton. Therefore, the evidence established that Rodgers had been in possession of two different firearms on at least two different occasions while under a weapons disability. Given this evidence, we do not find that the jury lost its way or created a manifest miscarriage of justice in finding Rodgers guilty of both counts of having weapons while under disability. Therefore, we do not find that Rodgers' convictions for those counts

were against the manifest weight of the evidence.

**{¶ 94}** Rodgers' fourth assignment of error is overruled.

## Conclusion

**{¶ 95}** Having overruled all four assignments of error raised by Rodgers, the judgments of the trial court are affirmed.

. . . . . . . . . . . . .

EPLEY, J. and LEWIS, J., concur.